UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY; ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY; and ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY, | Civil Action No. _____ |
| Plaintiffs, | |
| v. | **Demand for Jury Trial** |
| NEXTGEN PAIN ASSOCIATES & REHABILITATION LLC; NEXTGEN REHAB LLC; NEXTGEN DIAGNOSTICS LLC; CARE RECOVERY LLC; METRO MED PAIN MANAGEMENT & REHAB PLC; ABDUL BAYDOUN; NURA KUTOB; ALI BEYDOUN; DAOUD FARAJ, M.D.; and HORST GRIESSER, M.D., | |
| Defendants. | |

## <u>COMPLAINT</u>

Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company (hereinafter, "Allstate" and/or "plaintiffs"), by their attorneys SMITH & BRINK, hereby allege as follows.

1

## I. __INTRODUCTION__

1.     This case is about medical clinics, a diagnostic center, and the physicians, owners, managers, agents, and representatives of the same who abused the unlimited benefits available under the Michigan No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq*., by engaging in a scheme to defraud Allstate by submitting and causing to be submitted false and fraudulent medical records, bills, and invoices through the U.S. Mail seeking payment under the No-Fault Act for treatment and services that were not actually rendered, were medically unnecessary, were fraudulently billed, and were not lawfully rendered.

2.     Defendants Nextgen Pain Associates & Rehabilitation LLC ("Nextgen Pain"); Nextgen Rehab LLC ("Nextgen Rehab"); Nextgen Diagnostics LLC ("Nextgen Diagnostics"); Care Recovery LLC ("Care Recovery"); and Metro Med Pain Management & Rehab PLC ("Metro Med Pain") (collectively, the "Defendant Entities"); Abdul Baydoun ("Baydoun"); Nura Kutob ("Kutob"); Ali Beydoun; Daoud Faraj, M.D. ("Faraj"); and Horst Griesser, M.D. ("Griesser") (collectively with the Defendant Entities, the "defendants") each conspired to, and did in fact, defraud Allstate by perpetuating an insurance billing fraud scheme in violation of state and federal law.

3.     The purpose of the fraudulent scheme devised and implemented by the defendants was to generate claims to, and collect payments from, Allstate pursuant

to Michigan's No-Fault Act for the alleged treatment of patients who had purportedly been involved in motor vehicle accidents.

4.       The defendants engaged in a fraudulent scheme to consistently bill Allstate for services that were never actually provided to patients and manufactured documents to make it appear as though patients received services when, in fact, no such services were rendered.

5.       The treatment, if provided at all, consisted of unreasonable and unnecessary prescriptions for medication and physical therapy, urine drug testing, diagnostic tests, unnecessary disability certificates, and billing for treatment by an unqualified doctor.

6.       The defendants also engaged in several fraudulent billing practices, including upcoding office visits in order to charge Allstate for more services than were actually provided.

7.       The defendants also charged excessive amounts that far exceeded reasonable and customary billing for services, including urine drug testing and procedures.

8.       Each of the defendants named herein conspired with one another to accomplish and to further the objectives of their fraudulent scheme.

9.       All of the acts and omissions of the defendants, described throughout this Complaint, were undertaken intentionally.

10.     The insurance fraud scheme perpetrated by the defendants was designed to, and in fact did, result in the payment of No-Fault benefits from Allstate to, and on behalf of, the defendants.

11.     By this Complaint, and as detailed in each count set out below, Allstate brings this action for: (1) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962(c) and (d); (2) common law fraud; (3) civil conspiracy; (4) payment under mistake of fact; and (5) unjust enrichment.

12.     Allstate's claim for compensatory damages includes: (1) payments made by Allstate to Nextgen Pain, Nextgen Rehab, Nextgen Diagnostics, Care Recovery, and Metro Med Pain in reliance upon the false representations that they were eligible to receive payment under the Michigan No-Fault Act, (2) treble damages, (3) statutory interest, (4) costs, including but not limited to the costs of claims handling and the cost of investigation to uncover the fraudulent scheme perpetrated by the defendants, and (5) attorney's fees.

13.     Allstate also seeks a declaration pursuant to 28 U.S.C. § 2201 that the defendants have no right to receive payment for any previously-denied and pending bills submitted to Allstate whereas (1) the defendants billed Allstate for services that were not rendered; (2) the defendants billed Allstate for services and treatment that were not reasonably necessary; and (3) the defendants engaged in a pervasive pattern

and practice of submitting false medical documentation through the U.S. Mail demanding payment from Allstate.

14.     As a result of the defendants' fraudulent acts, Allstate has paid in excess of $86,266 to them related to the patients at issue in this Complaint.

## II.     THE PARTIES

### A.     PLAINTIFFS

15.     Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company are each companies duly organized and existing under the laws of the State of Illinois.

16.     Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company each have their respective principal places of business in Northbrook, Illinois.

17.     At all times relevant to the allegations in this Complaint, the plaintiffs were authorized to conduct business in the State of Michigan.

### B.     DEFENDANTS

#### 1.     Nextgen Pain Associates & Rehabilitation LLC

18.     Nextgen Pain Associates & Rehabilitation LLC is a limited liability company organized under the laws of the State of Michigan.

19.     Nextgen Pain was owned and controlled by Baydoun.

20.     Nextgen Pain was controlled and operated by Kutob as its manager.

21.     Nextgen Rehab participated in the operation of Nextgen Pain by sending patients to Nextgen Pain, facilitating the unlawful and medically unnecessary treatment, when treatment was in fact rendered, billed by Nextgen Pain.

22.     Nextgen Diagnostics participated in the operation of Nextgen Pain by billing Allstate for diagnostic testing that created the appearance of injury and permitted Nextgen Pain to continue billing Allstate for unlawful and medically unnecessary treatment.

23.     Nextgen Pain was controlled and operated by Griesser and Faraj as the treating physicians identified in the bills submitted to Allstate that are at issue herein.

24.     Nextgen Pain's principal place of business is located in Dearborn, Michigan.

25.     Nextgen Pain billed Allstate for services that were not rendered and treatment that was unlawful and medically unnecessary (to the extent treatment was rendered at all) in relation to several patients at issue herein, including the patients set out in Exhibit 1.

### 2.     Nextgen Rehab LLC

26.     Nextgen Rehab LLC is a limited liability company organized under the laws of the State of Michigan.

27.     Nextgen Rehab was owned and controlled by Baydoun.

6

28.     Nextgen Diagnostics participated in the operation of Nextgen Rehab by billing Allstate for diagnostic testing that created the appearance of injury and permitted Nextgen Rehab to continue billing Allstate for unlawful and medically unnecessary treatment.

29.     Nextgen Rehab's principal place of business is located in Dearborn, Michigan.

30.     Nextgen Rehab billed Allstate for services that were not rendered and treatment that was unlawful and medically unnecessary (to the extent treatment was rendered at all) in relation to several patients at issue herein, including the patients set out in Exhibit 2.

### 3.     Nextgen Diagnostics LLC

31.     Nextgen Diagnostics LLC is a limited liability company organized under the laws of the State of Michigan.

32.     Nextgen Diagnostics was owned and controlled by Baydoun.

33.     Nextgen Pain, its manager Kutob, Nextgen Rehab, Griesser, and Faraj participated in the operation and control of Nextgen Diagnostics by improperly referring patients to Nextgen Diagnostics that resulted in the unlawful and medically unnecessary diagnostic testing that was billed by Nextgen Diagnostics.

34.     Nextgen Diagnostics's principal place of business is located in Dearborn, Michigan.

35.     Nextgen Diagnostics billed Allstate for services that were unlawful and medically unnecessary (to the extent treatment was rendered at all) in relation to several patients at issue herein, including the patients set out in Exhibit 3.

### 4.     Care Recovery LLC

36.     Care Recovery LLC is a professional limited liability company organized under the laws of the State of Michigan.

37.     Faraj owned and controlled Care Recovery.

38.     Griesser and Faraj participated in the operation and control of Care Recovery as the treating physicians identified in the bills submitted to Allstate that are at issue herein.

39.     Nextgen Pain, including its owner Baydoun and manager Kutob, participated in the operation and control of Care Recovery by sending patients to Care Recovery, facilitating the unlawful and medically unnecessary treatment, when treatment was in fact rendered, billed by Care Recovery.

40.     Care Recovery's principal place of business is located in Dearborn, Michigan.

41.     Care Recovery billed Allstate for services that were not rendered and treatment that was unlawful and medically unnecessary (to the extent treatment was rendered at all) in relation to several patients at issue herein, including the patients set out in Exhibit 4.

### 5.    Metro Med Pain Management & Rehab PLC

42.    Metro Med Pain Management & Rehab PLC is a professional limited liability company organized under the laws of the State of Michigan.

43.    Ali Beydoun owned and controlled Metro Med Pain.

44.    Griesser participated in the operation and control of Metro Med Pain as the treating physician identified in the bills submitted to Allstate that are at issue herein.

45.    Care Recovery, including its owner Faraj, participated in the operation and control of Metro Med Pain by sending patients to Metro Med Pain, and facilitating the unlawful and medically unnecessary treatment, when treatment was in fact rendered at all, billed by Metro Med Pain.

46.    Metro Med Pain's principal place of business is located in Dearborn, Michigan.

47.    Metro Med Pain billed Allstate for services that were not rendered and treatment that was unlawful and medically unnecessary (to the extent treatment was rendered at all) in relation to several patients at issue herein, including the patients set out in Exhibit 5.

### 6.    Abdul Baydoun

48.    Abdul Baydoun is a resident and citizen of the State of Michigan.

49.     Baydoun owned and controlled Nextgen Pain, Nextgen Rehab, and Nextgen Diagnostics.

50.     As owner of Nextgen Pain, Nextgen Rehab, and Nextgen Diagnostics, Baydoun was responsible for the unlawful, medically unnecessary, and unreasonably charged services at issue in this Complaint, including the charges relating to the patients listed in Exhibits 1 through 3.

### 7.     Nura Kutob

51.     Nura Kutob is a resident and citizen of the State of Michigan.

52.     Kutob participated in the control and operation of Nextgen Pain as its manager.

53.     As manager of Nextgen Pain, Kutob was responsible for the unlawful, medically unnecessary, and unreasonably charged services at issue in this Complaint, including the charges relating to the patients listed in Exhibit 1.

### 8.     Ali Beydoun

54.     Ali Beydoun is a resident and citizen of the State of Michigan.

55.     Ali Beydoun participated in the control and operation of Metro Med Pain as its owner.

56.     As owner of Metro Med Pain, Ali Beydoun was responsible for the unlawful, medically unnecessary, and unreasonably charged services at issue in this Complaint, including the charges relating to the patients listed in Exhibit 5.

### 9.    **Daoud Faraj, M.D.**

57.    Daoud Faraj, M.D. is a resident and citizen of the State of Michigan.

58.    Faraj owned and controlled Care Recovery.

59.    As owner of Care Recovery, Faraj was responsible for the unlawful, medically unnecessary, and unreasonably charged services at issue in this Complaint, including bills relating to the patients listed in Exhibit 4.

60.    Faraj participated in the operation and control of Care Recovery and Nextgen Pain as the treating physician identified in the bills submitted to Allstate that are at issue herein, including bills relating to patients listed in Exhibits 1 and 4.

### 10.    **Horst Griesser, M.D.**

61.    Horst Griesser, M.D. is a resident and citizen of the State of Michigan.

62.    Griesser participated in the operation and control of Care Recovery, Nextgen Pain, and Metro Med Pain as the treating physician identified in the bills submitted to Allstate that are at issue herein, including bills relating to patients listed in Exhibits 1, 4, and 5.

## III.    **JURISDICTION AND VENUE**

63.    Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over this action relating to the claims brought by the plaintiffs under 18 U.S.C. § 1961 *et seq*. because they arise under the laws of the United States.

64.     Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over this action because the amount in controversy, exclusive of interest and costs, exceeds $75,000 against each defendant and because it is between citizens of different states.

65.     Supplemental jurisdiction over the plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

66.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) whereas the vast majority of the acts at issue in this Complaint were carried out within the Eastern District of Michigan.

## IV.   BACKGROUND ON THE DEFENDANTS AND THEIR SCHEME TO DEFRAUD

### A.   BAYDOUN AND ALI BEYDOUN'S UNLAWFUL OWNERSHIP OF NEXTGEN REHAB, NEXTGEN PAIN, NEXTGEN DIAGNOSTICS, AND METRO MED PAIN VIOLATED MICHIGAN LAW

67.     The State of Michigan requires that each owner of a professional service entity rendering services under the public health code "must be licensed or legally authorized in this state to render the same professional service."  Mich. Comp. Laws § 450.1284.

68.     Ali Beydoun is a layperson and has never been licensed by the State of Michigan to render any of the treatment and services billed to Allstate by Metro Med Pain.

69.     Thus, Ali Beydoun's ownership of Metro Med Pain violated Michigan law.

70.     Baydoun is a layperson and has never been licensed by the State of Michigan to render any of the treatment and services billed to Allstate by Nextgen Rehab, Nextgen Pain, and Nextgen Diagnostics.

71.     Thus, Baydoun's ownership of these entities violated Michigan law.

72.     In an attempt to conceal Baydoun's unlawful ownership in Nextgen Rehab, Nextgen Pain, and Nextgen Diagnostics, the defendants organized Nextgen Healthcare PLLC ("Nextgen Healthcare") on or about June 28, 2017.

73.     Baydoun falsely testified that Faraj is the owner of Nextgen Healthcare, the parent company that owns both Nextgen Pain and Nextgen Diagnostics, and that Nextgen Pain and Nextgen Diagnostics were "just management entities" that "doesn't generate any money" because "[a]ll of it flows through the parent company," Nextgen Healthcare.

74.     Baydoun also falsely testified that he has no interest or involvement in Nextgen Healthcare, Nextgen Pain, or Nextgen Diagnostics.

75.     All of Baydoun's statements were false and were made in an effort to deflect that layperson Baydoun is not lawfully permitted to operate medical clinics like the Defendant Entities.

76.     Despite his testimony that he was not employed by Nextgen Healthcare, Baydoun publicly held himself out to the public as Nextgen Healthcare's President:



77.    Further contradicting his testimony, Baydoun also held himself out as Nextgen Pain's CEO in correspondence on Nextgen Pain's letterhead:



**NEXTGEN PAIN ASSOCIATES & REHABILITATION LLC**

**Nextgen Pain Associates & Rehabilitation LLC**
Tel (313) 528-0181 • Fax (313) 528-0182
Email: nextgenpainmanagement@gmail.com

September 28, 2017

Allstate
PO Box 2874
Clinton, IA 52733

Re: W█████ A████ (████████) Claim #: 0428713127

Dear Sir or Madam,

Nextgen Pain Associates & Rehabilitation, LLC is owed $40,187.00 by the above-named patient in connection with our treatment of certain injuries suffered by the patient. We understand that you are insuring the patient in claims relating to the injuries.

Please notify us promptly if now or in the future there is any judgment, settlement, or other resolution of the claims or your insuring of the patient terminates. All payments on the patient's account should be sent to the following address:

> Nextgen Pain Associates & Rehabilitation, LLC
> 2900 Polo Parkway, Suite 200
> Midlothian, VA  23113
> *Please place Patient Name and Case P-2017-2431 on memo of check*

Thank you, and please contact us with any questions.

Sincerely yours,

Abe Baydoun
CEO

78.    A physician who previously worked at Nextgen Pain confirmed that Baydoun controlled the clinic and testified that he had a contract with Baydoun to treat patients at Nextgen Pain:

```
4    A.  Actually, at that time I was employer and
5        independent contractor with NextGen, N-e-x-t-G-e-n
6        Abe, Abe Baydoun, is the CEO who we had a contract
7        with.  He -- so I --
8    Q.  How --
9    A.  So I actually saw these patients, not at my office,
0        but at an office in Dearborn.
1    Q.  When you say these patients, you mean patients that
2        you saw through this --
3    A.  Through his company, correct.
4    Q.  -- this relationship with NextGen?
5    A.  Yes.
6    Q.  Okay.  How long did you have this independent
7        contractor relationship with NextGen?
8    A.  About three to four months.
```

79.     Baydoun also falsely testified that Muhammad Awaisi, M.D. was the
only person who owned Nextgen Rehab when in fact it was Baydoun.

80.     It is clear that Baydoun attempted to conceal the true nature of his
ownership interest and control in Nextgen Rehab, Nextgen Pain, and Nextgen
Diagnostics because he knew that he could not lawfully own and operate the same
as a layperson.

**B.     THE DEFENDANT ENTITIES WERE CREATED TO CONCEAL THE
EXTENT OF THE DEFENDANTS' SCHEME TO DEFRAUD**

81.     Layperson Baydoun unlawfully organized Nextgen Rehab on October
19, 2016.

82.     Nextgen Rehab was a pain management facility that billed Allstate for
office visits, injections, and various other procedures.

83.    Baydoun stated to Allstate that Nextgen Rehab stopped seeing patients sometime around February 25, 2017, following a "mishap" with Reese James, D.O. ("James").

84.    On February 23, 2017, LARA filed an Administrative Complaint against James alleging that James overprescribed commonly abused and diverted controlled substances, including carisoprodol, hydrocodone, oxycodone, and oxymorphone without medical necessity, and that James put patients at risk by prescribing dangerous combinations of controlled substances.

85.    James's overprescribing of commonly abused and diverted controlled substances and his prescribing of dangerous combinations of controlled substances that put patients at risk was the "mishap" that forced Baydoun to close Nextgen Rehab.

86.    Baydoun organized Nextgen Pain within days of closing Nextgen Rehab in order to create a replacement pain management facility to continue submitting bills to insurers such as Allstate.

87.    Nextgen Pain continued to bill Allstate relating to patients who were also the subject of bills submitted to Allstate by Nextgen Rehab.

88.    Baydoun organized Nextgen Diagnostics on February 2, 2017 for the purpose of submitting charges to insurers for diagnostic testing services.

89.    Faraj organized Care Recovery on May 16, 2019.

90.    Care Recovery billed Allstate for treatment relating to patients who were previously the subject of bills submitted by Nextgen Pain.

91.    Ali Beydoun organized Metro Med Pain on October 17, 2019.

92.    Metro Med Pain billed Allstate for treatment relating to patients who were previously the subject of bills submitted by Care Recovery.

93.    Nextgen Rehab, Nextgen Pain, Nextgen Diagnostics, and Care Recovery each billed Allstate indicating treatment was purportedly provided to patients at the same location: 13530 Michigan Avenue, Dearborn, Michigan.

94.    Metro Med Pain billed Allstate indicating treatment was purportedly provided to patients at 4520 Firestone Street, Dearborn, Michigan.

95.    However, other than Nextgen Diagnostics, no Defendant Entity billed Allstate for treatment that overlapped with any other Defendant Entity, as evidenced when comparing Exhibits 1 through 5 attached hereto, summarized in the following chart:

| Defendant Entity | First Date of Service Billed to Allstate | Last Date of Service Billed to Allstate |
|---|---|---|
| Nextgen Diagnostics | January 7, 2017 | June 12, 2018 |
| Nextgen Rehab | October 21, 2016 | February 25, 2017 |
| Nextgen Pain | March 3, 2017 | April 5, 2019 |
| Care Recovery | May 14, 2019 | November 13, 2019 |
| Metro Med Pain | November 20, 2019 | Present |

96.    Put differently, Nextgen Rehab, Nextgen Pain, Care Recovery, and Metro Med Pain were each used to conceal the full extent of the defendants' fraudulent scheme by submitting bills for treatment using several different names

and taxpayer identification numbers in an attempt to deflect attention and avoid Allstate detecting their fraud.

## V.   BILLING FOR SERVICES NOT RENDERED

97.   The defendants' pervasive pattern of mailing demands for payment to Allstate for services that were not rendered is indicative of their goal to submit as many claims for payment as possible regardless of whether the treatment was actually rendered and whether it was medically necessary (discussed in detail *infra*).

98.   The defendants routinely submitted claims seeking payment for services that were not performed in each of the categories set forth below.

### A.   BILLING FOR PATIENT EXAMINATIONS NOT PERFORMED

99.   Nextgen Pain submitted bills to Allstate seeking payment for patient examinations purportedly performed by Bruce Kallou, D.P.M. ("Kallou") when Kallou was not physically present at Nextgen Pain.

100.   Kallou testified that he only worked at Nextgen Pain on Tuesday afternoons and Thursdays.

101.   However, Nextgen Pain billed Allstate for patient examinations purportedly performed by Kallou on days of the week when Kallou was admittedly not physically present at Nextgen Pain.

102.   The following patients are representative exemplars of bills submitted by Nextgen Pain for patient examinations not performed:

19

- Nextgen Pain billed Allstate seeking payment for a follow-up patient examination relating to patient N.A. (Claim No. 0421986720)[1] that was purportedly performed by Kallou on Monday, September 11, 2017. Kallou testified that he did not work at Nextgen Pain on Mondays. Thus, Kallou could not have performed the September 11, 2017 follow-up patient examination that Nextgen Pain billed to Allstate relating to N.A.  Thus, Nextgen Pain billed Allstate for a patient examination that was never performed.

- Nextgen Pain billed an Allstate affiliate seeking payment for an initial patient examination relating to patient Q.C. (Claim No. TXA-0190398) that was purportedly performed by Kallou on Friday, September 22, 2017.  Kallou testified that he did not work at Nextgen Pain on Fridays. Thus, Kallou could not have performed the September 22, 2017 initial patient examination that Nextgen Pain billed relating to Q.C.

- Nextgen Pain billed an Allstate affiliate seeking payment for an initial patient examination relating to patient H.S. (Claim No. TXA-0192428) that was purportedly performed by Kallou on Friday, September 22, 2017 even though Kallou testified that he did not work at Nextgen Pain on Fridays.  As such, Kallou could not have performed the September 22, 2017 initial patient examination and Nextgen Pain billed for an initial patient examination that was never performed.

103.   All of the claims submitted by the defendants to Allstate through the U.S. Mail seeking payment for patient examinations that were never performed are fraudulent.

104.   Allstate is not required to pay the defendants for examinations that were never performed relating to patients at issue in this Complaint and is entitled to

---

[1] To protect the confidentiality of the patients at issue herein, Allstate hereinafter refers to each patient by his or her initials and Allstate claim number.

recover any payments tendered to the defendants in reliance on their fraudulent billing for services not rendered.

### B.   BILLING FOR URINE DRUG TESTING NOT RENDERED

105.   Urine drug testing was one of the primary methods utilized by the defendants to inflate the amounts charged to Allstate per patient.

106.   Nextgen Pain billed Allstate for presumptive urine drug testing using Current Procedural Terminology ("CPT") Codes[2] 80305 and 80306 as a matter of course.

107.   However, Nextgen Pain did not perform any such presumptive urine drug testing.

108.   Baydoun stated to Allstate that Nextgen Pain sends the urine specimens that are collected from its patients to an outside laboratory for urine drug screening, confirming that Nextgen Pain did not perform the testing.

109.   Furthermore, Nextgen Pain failed to submit a single presumptive urine drug testing results report to Allstate to support any one of the presumptive urine drug testing charges submitted to Allstate using CPT Codes 80305 and 80306. *See* Exhibit 1.

---

[2] CPT Codes are published by the American Medical Association ("AMA") to facilitate the efficient processing of healthcare charges by insurance carriers and other private and governmental healthcare payors.

110.   All of the claims submitted by Nextgen Pain to Allstate through the U.S. Mail seeking payment for presumptive urine drug testing that it never performed are fraudulent.

111.   Allstate is not required to pay the defendants for presumptive urine drug testing that was never performed relating to patients at issue in this Complaint and is entitled to recover any payments tendered to the defendants in reliance on their fraudulent billing for services not rendered.

## C.   BILLING FOR INJECTIONS NOT PERFORMED

112.   Nextgen Pain frequently billed Allstate for injections and other procedures that it did not actually perform.

113.   For example, Nextgen Pain billed Allstate for an epidural steroid injection that was purportedly performed by Timothy Mattway, M.D. ("Mattway") relating to patient R.J. (Claim No. 0445568686).

114.   However, R.J. testified that she only received one epidural steroid injection in 2017 and that was performed by Johnny Trotter, M.D. ("Trotter"):

```
19 Q.   Other than the first injections that you got from

20       Dr. Trotter, have you gotten any other injections

21       since this accident?

22 A.   No.
```

115.   Allstate is not required to pay the defendants for injections that were not performed relating to patients at issue in this Complaint and is entitled to recover any payments tendered to the defendants in reliance on their fraudulent billing for services not rendered.

## VI.   ILLEGAL KICKBACKS, INDUCEMENTS, AND SOLICITATION

116.   In order to maximize the amount they could bill to insurers such as Allstate, the defendants utilized the services of runners to obtain a steady and continuous flow of patients by identifying victims of motor vehicle accidents and directing them to present to the defendants in furtherance of the scheme to defraud Allstate.

117.   Michigan law prohibits "[a]ny physician or surgeon engaged in the practice of medicine in this state" to "employ any solicitor, capper, or drummer for the purpose of procuring patients."  Mich. Comp. Laws § 750.429.

118.   Other conduct prohibited under Michigan law includes identification and solicitation of potential patients of medical providers, the use of agents to solicit patients, and the receipt of fees obtained through such fraudulent methods, including the mere participation in any schemes relating to such activity.  *See* Mich. Comp. Laws §§ 750.410b, 750.429, 257.503, and 500.4503(h)-(i).

119.   It is also illegal in Michigan to contact any motor vehicle accident victim to offer a service within thirty (30) days of the accident, Mich. Comp. Laws

§ 750.410b, or use police reports to solicit any person identified in the report, Mich. Comp. Laws § 257.503.

120.   Only "lawfully-render[ed] treatment" is compensable under Michigan's No-Fault Act.  Mich. Comp. Laws § 500.3157(1).

121.   As set forth below, the defendants participated in and knowingly benefitted from obtaining patients who were improperly influenced to present to the Defendant Entities by factors other than legitimate medical judgment.

122.   For example, victims of motor vehicle accidents received telephone calls within days of their motor vehicle accident from Moussa Harb ("Moussa"), a known runner.

123.   Moussa illegally contacted victims mere days after the alleged motor vehicle accident promising compensation if the individual would present to a doctor's office at the corner of Michigan Avenue and Schaefer Road, the exact intersection where Nextgen Rehab, Nextgen Pain, Nextgen Diagnostics, and Care Recovery were physically located.

124.   Moussa offered to have a transportation company pick up the individual, falsely telling people that doctors and insurance companies do not want them driving themselves to appointments.  In reality, Moussa wanted to coerce these people into appearing at the Defendant Entities.

125.   In one instance, while speaking with an individual over the telephone, Moussa stated that he would have his boss "Ali" call him back to provide further information on retaining a specific personal injury law firm and also provide the name of the doctor to present to if he wanted to receive the discussed kickback payment.

126.   Shortly thereafter, this individual received a telephone call from a man who introduced himself as Ali Beydoun who stated that he worked with a personal injury law firm and directed this person to treat with Griesser if he wanted to obtain money.

127.   Ali Beydoun is related to Baydoun and Kutob, stating to Allstate that he is Baydoun's cousin.

128.   Nextgen Pain, Care Recovery, and Metro Med Pain have each submitted bills seeking payment for treatment allegedly rendered by Griesser.

129.   Furthermore, the Articles of Organization identifying Faraj as the named organizer of Nextgen Healthcare contains a facsimile header that indicates the Articles of Organization were submitted to the State of Michigan on June 27, 2017 using the fax machine of City Xpress, L.L.C.

130.   Ali Beydoun is identified as a member of City Xpress, L.L.C. in its corporate filings.

131.   Ali Beydoun is the named organizer of defendant Metro Med Pain.

25

132.   Thus, Ali Beydoun is associated with each of the defendants named in Allstate's Complaint.

133.   The defendants also relied upon referral agreements between medical doctors to obtain patients.

134.   Baydoun testified that Angelo Sorce, M.D. ("Sorce") was a physician at both Nextgen Rehab and Nextgen Pain.

135.   According to Bachu Abraham, M.D. ("Abraham"), a doctor in the same building, he had an agreement with Sorce to refer patients to him.

136.   On September 28, 2016, Sorce and Abraham had an argument because Sorce was upset that Abraham was not sending him enough patients.

137.   The argument became physical, and Sorce was ultimately arrested.

138.   Notably, this argument over *pro forma* patient referrals did not mention medical necessity.

139.   Sorce continued to work at Nextgen Pain after this incident.

140.   The defendants obtained patients who were improperly influenced to present to the Defendant Entities by factors other than legitimate medical judgment, such as promises of financial compensation and patient referral agreements, which renders the treatment provided (if at all) unlawful and therefore not compensable.

141.   These factors also confirm the lack of medical necessity of the defendants' billed-for "treatment."

26

## VII.  **FALSIFIED MEDICAL RECORDS**

142.  As part of their scheme to defraud, and to disguise their fraud to prevent discovery, the defendants submitted falsified medical records for the purpose of falsely trying to justify the charges submitted to Allstate.

143.  Nextgen Pain billed Allstate for evaluations and treatment allegedly rendered by Kallou, a doctor of podiatric medicine.

144.  Podiatric medicine is a medical specialty focusing on diagnosing and treating conditions affecting the foot and ankle.

145.  Nextgen Pain fabricated bills and medical records submitted to Allstate in order to falsely identify Kallou as a medical doctor.

146.  For example, Nextgen Pain billed Allstate for a patient examination relating to patient N.Y. (Claim No. 0276927241) that was purportedly performed by Kallou on August 7, 2017, which was a Monday.

147.  Kallou, who did not work at Nextgen Pain on Mondays, allegedly documented N.Y.'s complaints as pain in his lumbar spine, right knee, and both hips as well as examined his head, eyes, ears, nose, throat, heart, abdomen, upper extremities, lower extremities, lumbar spine, and right knee.

148.  As only a podiatrist, Kallou was not qualified to make any of these findings or to perform this alleged examination.

149.   Nextgen Pain billed Allstate for a patient examination relating to N.Y. that was purportedly performed by Kallou on September 5, 2017.

150.   Kallou allegedly diagnosed N.Y. with lumbargo, right knee pain, and bilateral hip pain.

151.   A podiatrist is not qualified to diagnose a patient with lumbargo, right knee pain, and bilateral hip pain.

152.   Thus, in order to defraud Allstate, Nextgen Pain falsified its bill to falsely claim that Kallou was a medical doctor on the bill submitted to Allstate:



153.   In another example of the defendants' fabrication of medical records in order to falsely justify bills submitted to Allstate are the charges submitted by Nextgen Rehab relating to H.E. (Claim No. 0405436080).

154.   Nextgen Diagnostics billed Allstate for electrodiagnostic testing relating to H.E. that was purportedly performed by Hamad Houwari, M.D. ("Houwari") on January 7, 2017 at Nextgen Pain.

155.   However, Nextgen Diagnostics did not submit its bill for the electrodiagnostic testing and the alleged supporting electrodiagnostic testing results to Allstate until April 3, 2017.

156.   Allstate then received a bill from Nextgen Rehab on May 30, 2017 for the electrodiagnostic testing relating to H.E. that was purportedly performed by Houwari on January 7, 2017 at Nextgen Pain.

157.   Additionally, Nextgen Rehab submitted the identical electrodiagnostic testing results report that Nextgen Diagnostics submitted almost two (2) months prior.

158.   The only difference is the electrodiagnostic testing results report submitted by Nextgen Rehab was now on Nextgen Rehab's letterhead.

159.   Other than the new letterhead, there were no changes to the alleged results contained in the report and each report is signed by Houwari.

160.   In other words, Nextgen Rehab billed Allstate for electrodiagnostic testing that was initially billed by Nextgen Diagnostics relating to H.E. on January 7, 2017 and, in order to falsely justify its charges, Nextgen Rehab fabricated the electrodiagnostic testing results to falsely indicate that Nextgen Rehab performed the electrodiagnostic testing on January 7, 2017.

161.   Allstate relied upon the fabricated bills and medical records submitted by the defendants in adjusting the claims at issue herein.

162.   Allstate is not required to pay the defendants for charges supported by fabricated medical records relating to patients at issue in this Complaint and is

entitled to restitution for any payments tendered to the defendants in reliance on their misrepresentations.

## VIII.  BILLING FOR UNLAWFUL TREATMENT

163.   Nextgen Pain, Nextgen Rehab, and Metro Med Pain unlawfully billed Allstate for issuing durable medical equipment ("DME") without the required licensure from the State of Michigan.

164.   The State of Michigan requires a provider to obtain a license from the Michigan Board of Pharmacy in order to issue medical equipment/devices to individuals.  Mich. Comp. Laws §§ 333.16106(2), 333.17703(2), 333.17705(3), and 333.17722.

165.   Nextgen Pain, Nextgen Rehab, and Metro Med Pain have never possessed a license to issue DME in the State of Michigan.

166.   Nextgen Pain, Nextgen Rehab, and Metro Med Pain submitted bills to Allstate through the U.S. Mail seeking payment for DME allegedly issued to patients at issue herein unlawfully without a license.  *See* Exhibits 1, 2, and 5.

167.   Unlawfully provided services are not compensable under the Michigan No-Fault Act.  Mich. Comp. Laws § 500.3157(1).

168.   Allstate is not required to pay Nextgen Pain, Nextgen Rehab, and Metro Med Pain for the unlawful issuance of DME and is entitled to restitution for monies

paid in reliance on these defendants' false representations that they had complied with Michigan law, including necessary licensure.

## IX.   EXCESSIVE AND MEDICALLY UNNECESSARY TREATMENT

169.   The defendants billed Allstate for excessive and medically unnecessary treatment, if provided at all, that consisted of unnecessary urine drug testing, unwarranted electrodiagnostic testing, unsupported disability certificates, and prescriptions for unnecessary physical therapy and highly addictive narcotic medications designed to ensure patients continued to present to the defendants on a regular basis, thereby allowing the defendants to continue to fraudulently bill Allstate.

### A.   BILLING FOR EXCESSIVE AND MEDICALLY UNNECESSARY URINE DRUG TESTING

170.   Nextgen Pain and Metro Med Pain billed Allstate for presumptive urine drug testing that was billed as a matter of course and was not used to determine or adjust each patient's treatment plan.

171.   Nextgen Pain and Metro Med Pain routinely billed for presumptive urine drug testing for the same patient on a regular schedule, often within mere weeks of each other.

172.   In fact, Nextgen Pain and Baydoun acknowledged that Nextgen Pain predetermines that every patient must provide a urine specimen at each visit and that

each specimen collected is subject to testing.   This is not a patient-specific determination of medical need.

173.   Nextgen Pain and Metro Med Pain also routinely billed for presumptive urine drug testing on urine specimens provided by patients who were not prescribed controlled substances at all, rendering such urine drug testing unnecessary.

174.   Presumptive urine drug testing is used by providers to obtain immediate drug testing results indicating whether a patient's specimen contains the prescribed medication, an illicit substance, and/or a non-prescribed medication.

175.   Toxicology monitoring is only reasonable and medically necessary when it is performed randomly to assess a patient's compliance with treatment with controlled substances.

176.   Nextgen Pain and Metro Med Pain billed Allstate for presumptive urine drug tests performed as a matter of course and without regard to medical necessity.

177.   The presumptive urine drug testing billed to Allstate had no effect on medical decision making by Nextgen Pain and Metro Med Pain.

178.   The excessive and unnecessary presumptive urine drug testing billed to Allstate is exemplified by the following patients:

- Patient I.A. (Claim No. 0499693330) presented to Nextgen Pain on May 7, 2018 for an initial evaluation purportedly performed by Griesser.  Griesser prescribed I.A. with Ultram on May 7, 2018 and July 5, 2018.   Griesser then prescribed I.A. with Norco starting on September 6, 2018 through March 22, 2019.  I.A. allegedly provided a specimen for urine drug tests performed by Nextgen Pain at eight (8)

appointments from May 7, 2018 through January 7, 2019. Each of the eight (8) urine drug tests billed by Nextgen Pain was reported as negative, indicating that neither Ultram or Norco were present in any of I.A.'s urine specimens. The eight (8) corresponding medical records fail to indicate that these negative results were discussed with I.A. at any point during her alleged treatment. Instead, Griesser continued to prescribe I.A. Ultram and then Norco despite repeated negative results for these two prescribed opioid medications. As such, this alleged urine drug testing was unnecessary as it had no impact on I.A.'s treatment or care.

- Patient W.H. (Claim No. 0455908780) presented to Nextgen Pain on April 13, 2018 for an initial evaluation purportedly performed by Griesser. Griesser prescribed W.H. with Norco starting on April 13, 2018 through October 5, 2018. W.H. allegedly provided a specimen for urine drug tests performed by Nextgen Pain at five (5) appointments from April 13, 2018 through October 5, 2018. Each of the five (5) urine drug tests billed by Nextgen Pain was reported as negative, indicating that Norco was not present in W.H.'s urine specimens except for the urine drug test billed on September 4, 2018. W.H.'s urine specimen was positive for "OXY and OPI." The four (4) corresponding medical records fail to indicate that the negative results were discussed with W.H. at any point during his alleged treatment. Instead, Griesser continued to prescribe W.H. Norco despite repeated negative results for this prescribed opioid medication. As such, this alleged urine drug testing was unnecessary as it had no impact on W.H.'s treatment or care.

- Patient M.F. (Claim No. 0525037800) presented to Metro Med Pain on December 3, 2019 for an initial evaluation purportedly performed by Griesser. M.F. allegedly provided Metro Med Pain with urine specimens for urine drug testing that was billed by Metro Med Pain during four (4) office visits from December 3, 2019 through March 10, 2020. Griesser, however, did not prescribe M.F. opioids or narcotics until March 10, 2020. Therefore, Metro Med Pain billed Allstate for urine drug testing that was not actually meant to guide M.F.'s care on December 3, 2019, January 10, 2020, and February 10, 2020. Instead, the urine drug testing was billed in order to inflate the amount Metro Med Pain charged to Allstate for each date of service.

179.   Nextgen Pain and Metro Med Pain sent claims for payment to Allstate through the U.S. Mail for medically unnecessary urine drug testing relative to each exemplar patient referenced above, and Allstate reasonably relied upon the mailed documents in adjusting the claims.

180.   Billing for services that are not medically necessary for each patient's care, recovery, or rehabilitation is prohibited under the Michigan No-Fault Act.

181.   Allstate is not required to pay Nextgen Pain and Metro Med Pain for medically unnecessary presumptive urine drug testing and Allstate is entitled to a return of monies it paid to Nextgen Pain and Metro Med Pain for the medically unnecessary presumptive urine drug testing billed to Allstate.  *See* Exhibits 1 and 5.

### B.   UNWARRANTED ELECTRODIAGNOSTIC TESTING

182.   Nextgen Rehab, Nextgen Pain, Nextgen Diagnostics, and Metro Med Pain billed for unnecessary and excessive electrodiagnostic tests.

183.   Electrodiagnostics is the branch of medicine that measures electrical potentials from nerves and muscles to determine if there is inherent pathology.

184.   Electrodiagnostic testing includes electromyography ("EMG") and nerve conduction studies ("NCS").

185.   EMG testing involves the use of an electromyography machine to record the electrical activity of a skeletal muscle to evaluate the existence of muscle and/or nerve abnormalities.

186.   An EMG is an invasive procedure that involves the insertion of a small needle electrode directly into an individual muscle.

187.   There are at least two components to a properly administered EMG test.

188.   First, after the needle is inserted below the skin, the muscle is examined at rest.

189.   In a normal muscle at rest, there is some reaction to the muscle when the needle is first pushed through the surface of the muscle and then the muscle becomes "silent."

190.   A damaged muscle – or a muscle that has experienced disruption of its normal nerve stimulation, as occurs in neuropathy or radiculopathy – continues to produce electric charges even at rest.

191.   The second component of the EMG test measures the electrical activity that occurs when the muscle is activated by a motor nerve.

192.   In a healthy muscle, a voluntary muscle movement produces a measurable electrical charge.

193.   If the nerve or root has been damaged, then some part of the muscle signal may be missing or abnormal.

194.   To perform a NCS, the clinician must measure nerve impulses following nerve stimulation and obtain information regarding the speed (i.e., velocity), timing, and strength (i.e., amplitude) of nerve impulses.

195.    NCS involve non-invasive tests in which peripheral nerves in the upper and lower limbs (i.e., arms and legs) are stimulated through the skin by the application of an electrical current.

196.    A brief shock is then delivered at a measured distance from the recording electrodes to stimulate the nerve, causing it to conduct an electrical wave of depolarization down each respective nerve.

197.    The velocity, amplitude, and shape of the response are then recorded by the recording electrodes attached to the surface of the skin.

198.    The electrical characteristics of the nerve responses are compared with well-defined normal responses to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers of peripheral nerves in the arms and legs.

199.    The results of the EMG and NCS testing billed by Nextgen Rehab, Nextgen Pain, Nextgen Diagnostics, and Metro Med Pain confirm unjustified testing resulting in a pattern of excess testing and unwarranted – and sometimes impossible – findings.

200.    The electrodiagnostic testing referred and billed by the defendants was unnecessary and problematic in several respects.

201.    First, such testing was not warranted or indicated based on the defendants' own findings and each patient's symptoms.

36

202.   Second, the electrodiagnostic testing was excessive, was not likely performed as billed, and the results of which contain unsupported and incredible results.

203.   Third, the electrodiagnostic testing that was billed did not in any way affect patient treatment, thus rendering it clinically useless.

## 1.   Unwarranted EMG and NCS Testing Not Supported by Documented Findings

204.   For EMG and NCS testing to be medically justified, the clinical examination must indicate symptoms or signs of radiculopathy.

205.   Radiculopathy is a pathological condition of the nerve roots where one or more root nerves along the spine become damaged causing radiating pain to the part of the body served by the particular nerve.

206.   Essentially, a radiculopathy is what is known as a "pinched nerve."

207.   The patient's subjective symptoms alone cannot support the performance of an electrodiagnostic study absent objective findings by the practitioner because such studies are an extension of the clinical exam.

208.   Conservative treatment should be performed prior to resorting to an invasive procedure such as electrodiagnostic testing.

209.   EMG and NCS studies are reserved for cases of actual neurologic abnormalities.

210.   EMG and NCS are not indicated where, as was the case with almost every patient at issue herein, neurologic deficits are not detected.

211.   Griesser routinely ordered EMG and NCS testing in the absence of any objective findings of abnormal neurology.

212.   If there is no history and physical evidence of a significant radiculopathy, as is the case for almost all of the patients at issue herein, there is nothing to be learned from the EMG that is of clinical significance.

213.   The defendants billed for EMG and NCS testing even when objective symptoms or signs of radiculopathy were absent from the clinical examination.

## 2.   Motor Vehicle Accidents Rarely Cause Radiculopathy

214.   The absence of objective symptoms and signs of radiculopathy in the patients of Nextgen Pain, Nextgen Rehab, Nextgen Diagnostics, and Metro Med Pain is not surprising because the entirety of the patients purported to be injured in motor vehicle accidents.

215.   Motor vehicle accidents only rarely cause neuropathy.

216.   A recent study examined the frequency of radiculopathy in motor vehicle accident patients.  Randall L. Braddom, *et al*., Frequency of Radiculopathies in Motor Vehicle Accidents, 39 Muscle & Nerve 545-547 (2009).

217.   The study found that motor vehicle trauma causes a slight increase over the baseline rate of cervical radiculopathy (8%) compared to non-motor vehicle

accident patients (6%), and that the frequency of lumbar radiculopathy in the two populations was the same (12%). Id.

218.   Therefore, cervical radiculopathy is only rarely caused by a motor vehicle accident and motor vehicle accidents do not cause a significant increase in the frequency of lumbar radiculopathy.

219.   Consequently, the lack of objective symptoms and signs of radiculopathy in the patients' medical records is consistent with the documented reality that motor vehicle accidents rarely cause radiculopathies.

### 3.   Electrodiagnostic Testing Was Billed Pursuant to a Predetermined Protocol and Did Not Affect Treatment

220.   The defendants routinely ordered physical therapy and diagnostic tests, including EMG and NCS studies, based upon the initial examinations of each patient.

221.   Electrodiagnostic testing is an extension of the clinical exam and should be used, if at all, in accordance with a patient's individualized objective symptoms.

222.   The nature and number of the peripheral nerves and the types of nerve fibers tested in a NCS should be dynamic (i.e., varied from patient to patient), and should never be based on a predetermined protocol.

223.   Likewise, the provision of EMG tests should not be conducted pursuant to a predetermined protocol of muscles to be tested.

224.   Such a protocol-based approach to electrodiagnostic testing can lead to overutilization of such testing, as happened with the defendants here.

225.   Overutilization of invasive electrodiagnostic studies subjects patients to unnecessary pain and exposes them to unnecessary risk for infection.

226.   The *pro forma* nature of these defendants' referrals for electrodiagnostic testing are evidenced by the fact that the results of the EMG and NCS testing were almost never used to affect or influence patient treatment.

227.   That is, Nextgen Rehab, Nextgen Pain, Nextgen Diagnostics, Metro Med Pain, and Griesser ordered and billed for EMG and NCS, but did not use the results to create, adjust, or direct each patient's treatment plan.

228.   Indeed, the defendants established a treatment plan before electrodiagnostic testing was ordered and before the results of the testing were known, thereby confirming that such electrodiagnostic testing was unnecessary.

229.   These treatment plans almost never changed even after the EMG/NCS results came back.

230.   If the defendants were capable of establishing treatment plans and their treatment plans never changed based on the electrodiagnostic testing done, then the EMG and NCS studies were not medically necessary and had no clinical utility.

231.   The defendants' billing for unwarranted electrodiagnostic testing is exemplified by the following patients:

40

- Patient H.E. (Claim No. 0405436080) was involved in an alleged motor vehicle accident on March 10, 2016. H.E. presented to Nextgen Rehab on January 6, 2017 for an initial evaluation purportedly performed by Joseph Shehadi, M.D. ("Shehadi"). Nextgen Rehab and Nextgen Diagnostics billed Allstate for an upper extremity EMG and NCS relating to H.E. on January 7, 2017. As discussed *supra*, Nextgen Rehab falsified its medical record dated January 7, 2017 detailing the electrodiagnostic testing results relating to H.E. Furthermore, without an objective finding of a neurologic deficit in the first place, the NCS studies were not supported and thus medically unnecessary as not indicated by H.E.'s clinical exam. The test returned results within normal limits. The normal findings of the unwarranted NCS studies confirms that there was no justification for ordering them in the first place. Nextgen Rehab and Nextgen Diagnostics therefore each billed Allstate $4,750.00 for medically unnecessary tests.

- Patient K.N. (Claim No. 0556984078) was involved in an alleged motor vehicle accident on August 11, 2019. K.N. presented to Metro Med Pain on December 10, 2019 for an initial evaluation purportedly performed by Griesser. Griesser indicated that K.N. complained of sharp shooting cervical and lumbar pain with some numbness at times. Griesser also reported no neurological deficit findings during the December 10, 2019 initial patient evaluation of K.N. Griesser issued K.N. a physical therapy prescription ordering physical therapy three (3) times a week for four (4) weeks and requiring K.N. return to Metro Med Pain for reevaluation in four (4) weeks. Yet, Metro Med Pain billed Allstate for an upper and lower extremity EMG and NCS relating to K.N. on December 18, 2019. As an initial matter, without an objective finding of a neurologic deficit in the first place, the NCS studies were not supported and thus medically unnecessary as not indicated by K.N.'s clinical exam. The test results reported no cervical or lumbar radiculopathy or myopathy. The normal findings of the unwarranted EMG and NCS studies confirm that there was no justification for ordering them in the first place. Metro Med Pain therefore billed Allstate $4,750.00 for medically unnecessary tests.

232. Allstate is not required to pay Nextgen Rehab, Nextgen Pain, Nextgen Diagnostics, and Metro Med Pain for diagnostic testing that is unnecessary, and

Allstate is entitled to a return of monies it paid to Nextgen Rehab, Nextgen Pain, Nextgen Diagnostics, and Metro Med Pain for these medically unnecessary diagnostic tests.

### C. THE DEFENDANTS INDISCRIMINATELY PRESCRIBED DANGEROUS AND ADDICTIVE NARCOTICS TO PATIENTS

233. Allstate insureds who were purportedly treated by Nextgen Pain and Metro Med Pain were nearly always prescribed addictive narcotic medications.

234. These powerful narcotics were rarely, if ever, indicated for the (at most) predominantly minor, soft-tissue injuries that the defendants' patients allegedly had.

235. The defendants prescribed these medications in total disregard for patient health, safety, and medical standards of practice.

236. The prescription of narcotic medications served a multitude of purposes for the defendants.

237. First, whether the patient became addicted, dependent, or was diverting the drugs on the street, they were more likely to be compliant with Nextgen Pain's and Metro Med Pain's treatment regimen and return to the defendant clinic to obtain prescription re-fills, which allowed the defendants to continue billing Allstate.

238. Second, by prescribing practically every patient controlled substances, the defendants could then claim the need to purportedly "monitor" the use of the drugs by scheduling follow-up appointments that would otherwise be medically unnecessary.

239.   Third, the prescription of dangerous amounts of narcotic drugs was used by the defendants to falsely justify their billing for unnecessary urine drug testing, as detailed above.

240.   Thus, the prescribing of controlled substances by the defendants served as a means to the end of billing Allstate for as much medically unnecessary treatment as possible as opposed to legitimate patient care.

241.   The defendants' default frequent prescription of opioid pain medication was particularly egregious, as it contributed to a significant public health crisis in Michigan.

242.   On October 26, 2015, a bipartisan task force formed by then Michigan Governor Rick Snyder issued a report "addressing the growing prescription drug and opioid problem in Michigan."

243.   The task force reported:

Prescription drug abuse has reached epidemic proportions. The increased availability of prescription drugs, coupled with general misperceptions regarding the safety of physician-prescribed medications, has led to exponential growth of drug users and drug abusers. In Michigan, the number of drug overdose deaths – a majority of which are from prescription drugs – has tripled since 1999.

244.   It has been estimated that the risk of addiction for patients receiving long-term prescriptions for opioid painkillers is as high as 56% of all such patients. Bridget A. Martell, *et al.*, <u>Systematic Review: Opioid Treatment for Chronic Back</u>

Pain: Prevalence, Efficacy, and Association with Addiction, 146(2) Ann. Intern.

Med. 116-127 (2007).

245.   The defendants' reckless prescriptions of drugs, especially narcotics, is

exemplified by the following patients:

- Patient L.P. (Claim No. 0486070451) presented to Nextgen Pain on April 17, 2018 for an initial evaluation purportedly performed by Griesser. During the next evaluation on May 17, 2018, Griesser prescribed the powerful narcotic Norco to L.P.  L.P. continued to receive a prescription for Norco throughout her time seeking treatment from Nextgen Pain.  L.P. consistently failed urine drug tests performed by Nextgen Pain, testing negative for opioid related substances, which suggests that the drugs were being illegally diverted.  Despite this, prescriptions for opioids were not reduced or altered in any way by the defendants as a result of these failed drug tests.  The urine drug testing performed on L.P. was not actually meant to guide patient care; it was performed to generate claims for submission to Allstate and to create the appearance of legitimate medication monitoring.

- Patient N.Y. (Claim No. 0276927241) presented to Nextgen Pain on April 27, 2017 for the first of five (5) evaluations.  At each office visit, N.Y. was provided with a prescription for Norco.  N.Y. consistently failed urine drug screens and urine drug tests performed by Nextgen Pain, testing negative for prescribed substances, which suggests that the drugs were being illegally diverted.  N.Y. only passed one urine drug test in his time treating at Nextgen Pain, and that was on September 5, 2017, after months of Norco prescriptions.  The urine drug testing performed on N.Y. was not actually meant to guide patient care; it was performed to generate claims for submission to Allstate and to create the appearance of legitimate medication monitoring.

- Patient A.Z. (Claim No. 0445532310) allegedly presented to Nextgen Pain for an initial evaluation on July 19, 2017.  At each office visit from June 4, 2018 through March 22, 2019, A.Z. was provided with a prescription for Norco.  A.Z. consistently failed urine drug screens and urine drug tests performed by Nextgen Pain, testing negative for

prescribed substances, which suggests that the drugs were being illegally diverted. The urine drug testing performed on A.Z. was not actually meant to guide patient care; it was performed to generate claims for submission to Allstate and to create the appearance of legitimate medication monitoring.

246.  The defendants' reckless and medically unnecessary prescriptions for narcotic medications were not rooted in reasonable medical care, but served instead to ensure the patients would appear for appointments for which the defendants billed Allstate.

### D.  UNNECESSARY PHYSICAL THERAPY PRESCRIPTIONS

247.  Nearly every patient was prescribed physical therapy almost immediately upon presenting to Nextgen Rehab, Nextgen Pain, Care Recovery, or Metro Med Pain.

248.  The physical therapy prescribed by Nextgen Rehab, Nextgen Pain, Care Recovery, and Metro Med Pain violated established standards of care.

249.  Physical therapy must be objectively indicated.

250.  That is, a patient's subjective complaints of pain are not sufficient to justify more than a few weeks of physical therapy.

251.  However, Nextgen Rehab, Nextgen Pain, Care Recovery, Metro Med Pain, Griesser, and Faraj prescribed extensive physical therapy based upon a patient's subjective symptoms alone.

252.   Nextgen Rehab, Nextgen Pain, Care Recovery, Metro Med Pain, Griesser, and Faraj repeatedly made misrepresentations regarding the necessity for physical therapy, including almost every time they wrote a prescription for physical therapy, to perpetuate unnecessary and expensive treatment that falsely bolstered and inflated the value of the insurance claim.

253.   Nextgen Rehab, Nextgen Pain, Care Recovery, Metro Med Pain, Griesser, and Faraj often wrote the physical therapy prescription during the initial evaluation for each patient at issue in this Complaint.

254.   In approximately ninety percent (90%) of all motor vehicle accident cases, mild injuries will resolve themselves within a few weeks without any treatment whatsoever.

255.   This fact supports that the immediate resort to physical therapy, as often happened due to Nextgen Rehab, Nextgen Pain, Care Recovery, Metro Med Pain, Griesser, and Faraj writing physical therapy prescriptions as a matter of course, was not related to the care, recovery, or rehabilitation of the patient, thus rendering such physical therapy medically unnecessary and not compensable under Michigan's No-Fault Act.

256.   Further, Nextgen Rehab, Nextgen Pain, Care Recovery, Metro Med Pain, Griesser, and Faraj routinely renewed prescriptions for physical therapy for months on end.

257.   The defendants did not consider the patients' response to physical therapy treatment in order to alter or manage their patients' care.

258.   Instead, patients at issue in the Complaint were prescribed physical therapy three (3) times a week for four (4) weeks in repeated loops regardless of the patient's age, injuries, or medical history.

259.   The defendants' excessive and unnecessary renewals of physical therapy prescriptions are exemplified by the following patients:

- Patient A.W. (Claim No. 0428713127) was allegedly in a motor vehicle accident on September 14, 2016.  A.W. presented to Nextgen Rehab on October 28, 2016 for an initial evaluation purportedly performed by James.   At this evaluation, approximately six (6) weeks after her accident, James provided A.W. with a prescription for physical therapy. A.W. received physical therapy for several months but her pain level continued to stay at levels 7 and 8.  She then presented to Nextgen Pain on June 7, 2017 for an evaluation purportedly performed by Joshua Gitlin, M.D. ("Gitlin").  Gitlin provided A.W. with a prescription for physical therapy at this appointment despite the fact that A.W. had received several months of physical therapy before this appointment. A.W. was provided with four (4) additional prescriptions for physical therapy from June 2017 to October 2017 by Nextgen doctors.  A.W.'s pain level never improved.  Nextgen Rehab and Nextgen Pain wrote physical therapy prescriptions as a matter of course not related to the care, recovery, or rehabilitation of A.W.

- Patient P.H. (Claim No. 0500213178) was allegedly in a motor vehicle accident on April 28, 2018.  On May 22, 2018, less than one month later, P.H. presented to Nextgen Pain for an initial evaluation purportedly performed by Griesser.   During this initial evaluation, Griesser provided P.H. with a prescription for P.H. to go to physical therapy three (3) times a week for four (4) weeks.  Griesser provided the prescription for physical therapy at every appointment until January 29, 2019, which was P.H.'s last appointment at Nextgen Pain.  Despite several months of physical therapy treatment, there is no evidence of

physical therapy improving P.H.'s pain.  Yet, Griesser continued to prescribe physical therapy treatment.  Nextgen Pain wrote physical therapy prescriptions as a matter of course and was not related to the care, recovery, or rehabilitation of the patient.

- Patient N.G. (Claim No. 0471961227) was allegedly in a motor vehicle accident on August 25, 2017.  N.G. presented to Nextgen Pain on November 24, 2017 for initial evaluation purported performed by Griesser.  During this initial evaluation, Griesser provided N.G. with a prescription for N.G. to go to physical therapy three (3) times a week for four (4) weeks.  N.G. was provided with four (4) prescriptions for physical therapy from November 2017 to March 2018 by Nextgen doctors.  During this time, N.G.'s pain level did not improve yet Griesser continued to prescribe physical therapy treatment.

260.   The defendants' nearly universal provision of physical therapy prescriptions was not rooted in reasonable medical care, but served instead to ensure the patients would appear for appointments for which the defendants billed Allstate.

## E.   UNSUPPORTED DISABILITY CERTIFICATES

261.   The defendants also issued disability certificates without regard to patients' medical need, both to bolster the appearance of a legitimate claim and also as an incentive to keep patients returning to each defendant.

262.   Nextgen Pain, Care Recovery, and Metro Med Pain provided disability certificates to patients as a matter of course, and nearly all patients of the defendants were medically disabled from driving at some point during the course of their treatment with the defendants.

263.   The overwhelming majority of patients at issue in this Complaint also received lucrative prescriptions for household services and attendant care during

their treatment with the defendants, with these disability certificates being repeatedly reissued by the defendants without any basis.

264.   As the disability certificates were written at one-month intervals, the patients were required to return to the defendants regularly for appointments, which were falsely billed to Allstate as patient examinations.

265.   Because the defendants issued substantially similar restrictions and disability prescriptions for every patient, regardless of their injury or status, such prescriptions were rarely, if ever, appropriate.

266.   In fact, these prescriptions were issued on a *pro forma* basis, and had no bearing on patients' actual needs or disability status.

267.   Considering the diversity of gender, age, comorbidities, and alleged injuries sustained in the defendants' patient population, it is highly improbable that the vast majority of patients at issue in this Complaint were actually disabled.

268.   In fact, the vast majority of patients at issue in this Complaint had no objective documented deficits that could substantiate ongoing disability.

269.   As an example of the defendants' indiscriminate disability certifications and prescriptions, patient A.D. (Claim No. 0516379781) was provided a disability certificate at each evaluation billed by Griesser at Nextgen Pain, Care Recovery, and Metro Med Pain.

270.   On February 11, 2019, April 4, 2019, June 14, 2019, July 23, 2019, October 3, 2019, October 31, 2019, November 29, 2019,  January 6, 2020, February 3, 2020, March 2, 2020, April 1, 2020, April 29, 2020, and June 3, 2020, Griesser disabled A.D. from work, restricted his driving, and prescribed household services.

271.   However, the medical records authored by Griesser not only fail to identify the reason A.D. was unable to continue working, they also fail to identify where A.D. was employed or what type of work A.D. performed.

272.   In fact, the medical records authored by Griesser that were submitted to Allstate by Nextgen Pain, Care Recovery, and Metro Med Pain fail to identify any restrictions relating to A.D. other than Griesser perfunctorily noting that A.D. "is to remain on total disability" in each medical record.

273.   The disability certificates issued by Griesser on February 11, 2019, April 4, 2019, June 14, 2019, July 23, 2019, October 3, 2019, October 31, 2019, November 29, 2019, January 6, 2020, February 3, 2020, March 2, 2020, April 1, 2020, April 29, 2020, and June 3, 2020 were each issued on a *pro forma* basis and had no bearing on A.D.'s actual needs or disability status.

274.   The disability certificates lasted for the duration of the patients' treatment by the defendants, beginning with the initial examination and continuing with the defendants' *pro forma* monthly renewal.

275.   The defendants' nearly universal provision of disability certificates was not rooted in reasonable medical care, but served instead to ensure the patients would appear for appointments for which the defendants billed Allstate.

## X.   FRAUDULENT BILLING FOR UPCODED OFFICE VISITS

276.   Certain treatment and procedures are billed using CPT Codes that reflect the level of complexity involved.

277.   It is the responsibility of the medical provider to select the CPT Code that accurately and truthfully identifies the services performed and the complexity involved in rendering those services.

278.   As discussed above, the defendants made misrepresentations to Allstate by submitting documents that included CPT Codes for medical services that (1) were not actually performed, (2) were not performed consistent with the AMA's requirements, and/or (3) were wholly unwarranted and unnecessary.

279.   Moreover, the billing codes submitted to Allstate by, and on behalf of, Nextgen Rehab, Care Recovery, and Metro Med Pain consistently exaggerated the level of services purportedly provided in order to inflate the charges submitted to Allstate.

280.   Most prominently, Nextgen Rehab, Care Recovery, and Metro Med Pain submitted bills to Allstate seeking payment for high-level office visits and office consultations that did not occur as billed.

281.   There are five (5) levels at which an office visit/examination or office consultation can be billed using CPT Codes: levels one (1) through five (5), with level one (1) being the least involved examination and level five (5) being the most complex.

282.   Initial office visits/examinations are billed using a CPT Code that starts with the numbers "9920."

283.   The final number that completes the five-digit CPT Code is one of the numerals between one (1) and five (5), depending on the extent of the examination.

284.   The criteria developed by the AMA to properly assign the CPT Code for an initial visit/examination include the components illustrated in the chart below:

|  | HISTORY | EXAMINATION | MEDICAL DECISION MAKING | FACE-TO-FACE TIME |
|---|---|---|---|---|
| 99201 | Problem focused | Problem focused | Straight forward | 10 minutes |
| 99202 | Expanded problem focused | Expanded problem focused | Straight forward | 20 minutes |
| 99203 | Detailed | Detailed | Low complexity | 30 minutes |
| 99204 | Comprehensive | Comprehensive | Moderate complexity | 45 minutes |
| 99205 | Comprehensive | Comprehensive | High complexity | 60 minutes |

285.   Reevaluation or follow-up visits/examinations are billed using a CPT Code that starts with the numbers "9921."

286.   The final number that completes the five-digit CPT Code is one of the numerals between one (1) and five (5), depending on the extent of the re-examination.

287.   The criteria developed by the AMA to properly assign the CPT Code for a reevaluation or follow-up visit/examination include the components illustrated in the chart below:

|       | HISTORY | EXAMINATION | MEDICAL DECISION MAKING | FACE-TO-FACE TIME |
|-------|---------|-------------|-------------------------|-------------------|
| 99211 | Minimal presenting problem(s) | Minimal presenting problem(s) | Minimal presenting problem(s) | 5 minutes |
| 99212 | Problem focused | Problem focused | Straight forward | 10 minutes |
| 99213 | Expanded problem focused | Expanded problem focused | Low complexity | 15 minutes |
| 99214 | Detailed | Detailed | Moderate complexity | 25 minutes |
| 99215 | Comprehensive | Comprehensive | High complexity | 40 minutes |

288.   Initial office consultations are billed using a CPT Code that starts with the numbers "9924."

289.   The final number that completes the five-digit CPT Code is one of the numerals between one (1) and five (5), depending on the extent of the examination.

290.   The criteria developed by the AMA to properly assign the CPT Code for an initial consultation include the components illustrated in the chart below:

|       | HISTORY | EXAMINATION | MEDICAL DECISION MAKING | FACE-TO-FACE TIME |
|-------|---------|-------------|-------------------------|-------------------|
| 99241 | Problem focused | Problem focused | Straight forward | 15 minutes |
| 99242 | Expanded problem focused | Expanded problem focused | Straight forward | 30 minutes |
| 99243 | Detailed | Detailed | Low complexity | 40 minutes |
| 99244 | Comprehensive | Comprehensive | Moderate complexity | 60 minutes |
| 99245 | Comprehensive | Comprehensive | High complexity | 80 minutes |

291.   The factors considered to determine the "complexity" of medical decision making in arriving at a proper CPT Code assignment for initial visits/examinations include:

| | NUMBER OF DIAGNOSES OR MANAGEMENT OPTIONS | AMOUNT AND/OR COMPLEXITY OF DATA TO BE REVIEWED | RISK OF COMPLICATIONS AND/OR MORBIDITY OR MORTALITY |
|---|---|---|---|
| **Straight forward decision making (CPT Code 99201-99202)** | Minimal | Minimal or none | Minimal |
| **Low complexity decision making (CPT Code 99203)** | Limited | Limited | Low |
| **Moderate complexity medical decision making (CPT Code 99204)** | Multiple | Moderate | Moderate |
| **High complexity medical decision making (CPT Code 99205)** | Extensive | Extensive | High |

292.   The AMA has published examples of office visits that are appropriately billed using CPT Code 99205, including:

- "Initial outpatient evaluation of a 69-year-old male with severe chronic obstructive pulmonary disease, congestive heart failure, and hypertension."

- "Initial office evaluation of a 65-year-old female with exertional chest pain, intermittent claudication, syncope and a murmur of aortic stenosis."

*CPT Assistant, Spring 1992*.

293.   The AMA has published examples of office visits that are appropriately billed using CPT Code 99204, including:

- "Office visit for initial evaluation of a 63-year-old male with chest pain on exertion."

- "Initial office evaluation of a 70-year-old patient with recent onset of episodic confusion.

- "Initial office visit for 7-year-old female with juvenile diabetes mellitus, new to area, past history of hospitalization three times."

*CPT Assistant, Spring 1992.*

294.   The AMA has published examples of office visits that are appropriately billed using CPT Code 99215, including:

- "Office visit with 30-year-old male, established patient 3 month history of fatigue, weight loss, intermittent fever, and presenting with diffuse adenopathy and splenomegaly."

- "Office visit for evaluation of recent onset syncopal attacks in a 70-year-old woman, established patient."

*CPT Assistant, Spring 1992.*

295.   The AMA has published examples of office visits that are appropriately billed using CPT Code 99214, including:

- "Office visit with 50-year-old female, established patient, diabetic, blood sugar controlled by diet.  She now complains of frequency to urination and weight loss, blood sugar of 320 and negative ketones on dipstick."

- "Follow-up visit for a 60-year-old male whose post-traumatic seizures have disappeared on medication, and who now raises the question of stopping the medication."

*CPT Assistant, Spring 1992.*

296. The patients at issue in this Complaint never presented with symptoms or diagnoses similar in severity or complexity to any of the examples set out above.

297. Instead, at most, the defendants' patients were involved in low-level motor vehicle accidents and presented with soft-tissue injuries and complaints.

298. Yet, Nextgen Rehab, Care Recovery, Metro Med Pain, Griesser, and Faraj almost always billed Allstate for level four (4) and five (5) examinations for patient evaluations (i.e., CPT Codes 99204, 99205, 99214, 99215, 99244, and 99245).

299. Nextgen Rehab billed for a level four (4) or five (5) evaluation 100% of the time with respect to patients at issue in this Complaint. *See* Exhibit 2.

300. Care Recovery, Griesser, and Faraj billed for a level four (4) or five (5) evaluation or consultation more than 83% of the time with respect to patients at issue in this Complaint. *See* Exhibit 4.

301. Metro Med Pain and Griesser billed for a level four (4) or five (5) evaluation or consultation more than 91% of the time with respect to patients at issue in this Complaint. *See* Exhibit 5.

302.   The defendants' billing for level four (4) or five (5) office visits constitutes a fraudulent misrepresentation of the services actually rendered, as the defendants rarely performed anything more than a perfunctory examination that often did not consist of anything more than asking patients a few questions (especially because the defendants already knew they were to going to follow their predetermined treatment protocol).

303.   By creating medical bills that included CPT Codes for office visits and then causing such bills to be mailed to Allstate, Nextgen Rehab, Care Recovery, Metro Med Pain, Griesser, and Faraj represented to Allstate that the invoiced medical services had been performed in conformity with the AMA's CPT Code Guidelines.

304.   However, all of the bills prepared and submitted by Nextgen Rehab, Care Recovery, Metro Med Pain, Griesser, and Faraj were submitted using fraudulent and deceptive examination CPT Codes.

305.   As such, Allstate is not obligated to pay any pending bills for office visits and is entitled to reimbursement for those office visits for which it has already tendered payment.

## XI.   EXCESSIVE AND UNREASONABLE CHARGES

306.   Nextgen Pain, Nextgen Rehab, Nextgen Diagnostics, Care Recovery, and Metro Med Pain submitted bills to Allstate containing charges that were so excessive and unreasonable that they could not have any valid basis.

307.   Nextgen Pain, Nextgen Rehab, and Nextgen Diagnostics also sold their accounts receivable to third-party factoring companies for a fraction of the face value of the bills, including sales to HMR – Fund III, LLC for only 26% of the amounts charged by Nextgen Pain, Nextgen Rehab, and Nextgen Diagnostics to Allstate.

308.   The fact that Nextgen Pain, Nextgen Rehab, and Nextgen Diagnostics are willing to accept one-quarter of their billed amount as payment in full confirms that their charges are outrageous and not in compliance with the No-Fault Act's mandate that only reasonable and customary charges are permissible.

### A.   MICHIGAN LAW REGARDING REASONABLE AND CUSTOMARY CHARGES

309.   The Michigan No-Fault Act is clear that only "reasonable charges" constitute allowable expenses thereunder.  Mich. Comp. Laws § 500.3107(1)(a).

310.   Michigan law is clear that the burden of proving the reasonableness of charges submitted for No-Fault benefits lies with the provider and the insurers have an obligation to police and challenge unreasonable charges.

311.   For the reasons discussed *infra*, the defendants cannot meet their burden, thereby dismissing Allstate's obligation to pay any of the unreasonable

charges for urine drug testing, DME, and evaluations, entitling Allstate to reimbursement for those amounts paid that are in excess of a reasonable amount for the services purportedly rendered.

### B.   EXCESSIVE AND UNREASONABLE URINE DRUG TESTING CHARGES

312. Nextgen Pain routinely submitted charges to Allstate that were significantly more than the customary amounts charged by other providers for the same services.

313. Nextgen Pain billed Allstate for a presumptive urine drug screen for every urine specimen that it collected.

314. All of the presumptive screening tests allegedly performed by Nextgen Pain were billed under CPT Code 80305 (*"Drug test(s), presumptive, any number of drug classes, qualitative; any number of devices or procedures, (e.g., immunoassay) capable of being read by direct optical observation only (e.g., dipstick, cups, cards, cartridges) includes sample validation when performed, per date of service"*) or CPT Code 80306 (*"Drug test(s), presumptive, any number of drug classes, qualitative; any number of devices or procedures, (e.g., immunoassay) read by instrumented assisted direct optical observation (e.g., dipstick, cups, cards, cartridges) includes sample validation when performed, per date of service"*).

315. There is no substantive difference between the type of urine drug screening indicated by CPT Codes 80305 and 80306 as both are billed to indicate

screening was performed by the immunoassay method using dipsticks, cups, cards, or cartridges to generate the results, yet Nextgen Pain billed the latter at more than three times the former.

316. Nextgen Pain invariably charged $400.00 when it billed CPT Code 80305 and $1,404.00 when it billed CPT Code 80306.

317. Allstate is not obligated to pay any pending bills for testing or procedures billed at excessive amounts, and it is entitled to reimbursement for those procedures for which it has already tendered payment.

### C.   EXCESSIVE AND UNREASONABLE DME CHARGES

318. Nextgen Pain and Metro Med Pain submitted charges for the DME that they were not licensed to issue at rates that were much higher than that of identical items found through numerous other retailers.

319. Nextgen Pain routinely charged Allstate $4,250.00 for issuing OrthoCor braces using Healthcare Common Procedure Coding System ("HCPCS") Code[3] E0761 for patients at issue in this Complaint. *See* Exhibit 1.

320. These braces require an OrthoCor "pod" in order to provide the advertised treatment.

---

[3] Another component of the medical billing coding system, HCPCS consists of alphanumeric codes used for non-physician services that are not identified with a CPT code.

321.   Nextgen Pain billed Allstate separately for these pods at a rate of $75.00 per pod.

322.   OrthoCor pods may be purchased in packages of fifteen pods for only $250.00 (or $16.67 per pod).

323.   Nextgen Pain sells these pods in bulk, often billing Allstate up to $13,500.00 for 180 pods each time OrthoCor devices were issued.

324.   Nextgen Pain therefore billed Allstate nearly four-and-a-half times more than the amount for which OrthoCor pods may be purchased.

325.   Metro Med Pain routinely charged Allstate $1,800.00 for issuing Industrial Back Support braces from Clint Pharmaceuticals using HCPCS Code L0637 for patients at issue in this Complaint.  *See* Exhibit 5.

326.   According to Clint Pharmaceuticals's own website, these identical Industrial Back Support braces are each available for purchase for only $17.49.

327.   Metro Med Pain therefore billed Allstate in excess of one hundred times more than the amount for which these same back braces may be purchased directly from its supplier, Clint Pharmaceuticals.

328.   Allstate is not obligated to pay any pending bills for equipment billed at excessive amounts, and it is entitled to reimbursement for those items for which it has already tendered payment.

### D. EXCESSIVE AND UNREASONABLE OFFICE VISIT CHARGES

329. Care Recovery, Nextgen Rehab, Nextgen Pain, and Metro Med Pain charged Allstate at excessive rates for patient evaluations.

330. Care Recovery billed Allstate $2,153.12 for level five (5) and $1,711.30 for level four (4) initial patient evaluations (CPT Codes 99205 and 99204) and $1,506.16 for level five (5) and $1,120.79 for level four (4) follow-up patient evaluations (CPT Codes 99215 and 99214).

331. Nextgen Rehab charged Allstate $650.00 for level four (4) initial patient evaluations (CPT Code 99204) and $500.00 for level four (4) follow-up patient evaluations (CPT Code 99214).

332. Nextgen Pain billed Allstate $500.00 for level four (4) initial patient evaluations (CPT Code 99204), $400.00 for level five (5) follow-up patient evaluations (CPT Code 99215), and $350.00 for level four (4) follow-up patient evaluations (CPT Code 99214).

333. Metro Med Pain billed Allstate $1,750.00 for level five (5) and $1,450.00 for level four (4) initial patient evaluations (CPT Codes 99205 and 99204) and $750.00 for level five (5) and $550.00 for level four (4) follow-up patient evaluations (CPT Codes 99215 and 99214).

334. Care Recovery, Nextgen Rehab, Nextgen Pain, and Metro Med Pain's charges are grossly excessive when compared to other prominent Michigan payors.

335.   For example, Medicare paid for patient evaluations performed in Dearborn (where the defendants are located) at the following amounts for patient evaluations performed from 2016 through 2020:

|  | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|
| CPT Code 99204 | $160.07 | $160.37 | $161.71 | $161.19 | $171.81 |
| CPT Code 99205 | $201.14 | $202.28 | $203.81 | $202.98 | $217.16 |
| CPT Code 99214 | $103.90 | $104.59 | $105.30 | $106.08 | $112.68 |
| CPT Code 99215 | $140.29 | $141.13 | $142.33 | $142.49 | $151.42 |

336.   Michigan Medicaid paid for evaluations from 2016 through 2020 as follows:

|  | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|
| CPT Code 99204 | $91.92 | $91.72 | $92.12 | $91.72 | $72.50 |
| CPT Code 99205 | $115.29 | $115.49 | $115.89 | $115.29 | $94.69 |
| CPT Code 99214 | $59.83 | $60.02 | $60.22 | $60.62 | $44.18 |
| CPT Code 99215 | $80.63 | $80.82 | $81.22 | $81.22 | $62.40 |

337.   The Michigan worker's compensation program paid for patient evaluations from 2016 through 2019 as follows:

|  | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|
| CPT Code 99204 | $220.84 | $217.47 | $218.17 | $222.32 |
| CPT Code 99205 | $275.06 | $273.12 | $275.11 | $280.20 |
| CPT Code 99214 | $142.39 | $140.97 | $141.92 | $144.22 |
| CPT Code 99215 | $190.73 | $190.29 | $191.50 | $195.00 |

338.   Allstate is not suggesting that it should pay only what other Michigan payors pay for patient evaluations.

339.   These payment amounts, however, are indicative of the range of what constitutes a reasonable charge.

340.   Care Recovery, Nextgen Rehab, Nextgen Pain, and Metro Med Pain submitted charges to Allstate that far exceed this spectrum of reasonable charges.

341.   The following table indicates the multiplied amounts by which Care Recovery, Nextgen Rehab, Nextgen Pain, and Metro Med Pain exceeded the other payors:

| Care Recovery | | | |
|---|---|---|---|
| | Medicare | MI Medicaid | MI WC |
| CPT Code 99204 | 10.61 | 18.65 | 7.70 |
| CPT Code 99205 | 10.61 | 18.67 | 7.68 |
| CPT Code 99214 | 10.55 | 18.48 | 7.77 |
| CPT Code 99215 | 10.57 | 18.54 | 7.72 |

| Nextgen Rehab | | | |
|---|---|---|---|
| | Medicare | MI Medicaid | MI WC |
| CPT Code 99204 | 4.05 | 7.07 | 2.94 |
| CPT Code 99214 | 4.78 | 8.33 | 3.51 |

| Nextgen Pain | | | |
|---|---|---|---|
| | Medicare | MI Medicaid | MI WC |
| CPT Code 99204 | 3.09 | 5.43 | 2.29 |
| CPT Code 99214 | 3.32 | 5.81 | 2.46 |
| CPT Code 99215 | 3.80 | 4.92 | 2.09 |

| Metro Med Pain | | | |
|---|---|---|---|
| | Medicare | MI Medicaid | MI WC |
| CPT Code 99204 | 9.00 | 15.81 | 6.52 |
| CPT Code 99205 | 8.62 | 15.18 | 6.25 |
| CPT Code 99214 | 5.18 | 9.07 | 3.81 |
| CPT Code 99215 | 5.26 | 9.23 | 3.85 |

342.   Michigan courts have explicitly stated that "medical care providers are prohibited from charging more than a reasonable fee."  McGill v. Auto. Ass'n, 207 Mich. App. 402, 405 (1994).

343.   Indeed, the Michigan No-Fault Act is clear that only "reasonable charges" constitute allowable expenses.  Mich. Comp. Laws § 500.3107(1)(a).

344.   The excessive nature of the patient evaluation charges submitted by Care Recovery, Nextgen Rehab, Nextgen Pain, and Metro Med Pain far exceed what constitutes a reasonable charge.

## XII.   MISREPRESENTATIONS MADE BY THE DEFENDANTS AND RELIED ON BY ALLSTATE

### A.   MISREPRESENTATIONS MADE BY THE DEFENDANTS

345.   To induce Allstate to promptly pay their fraudulent charges, the defendants submitted and caused to be submitted to Allstate false documentation that materially misrepresented that the services they referred for and billed for were necessary within the meaning of the Michigan No-Fault Act, and that all treatment was lawfully and actually rendered.

346.   Claims for medical benefits under Michigan's No-Fault Act can only be made for "reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation."  Mich. Comp. Laws § 500.3107(1)(a).

347.   Moreover, claims for medical benefits under Michigan's No-Fault Act can only be made for services that are "lawfully render[ed]."  Mich. Comp. Laws § 500.3157(1).

348.   Thus, every time the defendants submitted bills and medical records to Allstate supporting their claims for No-Fault benefits, the defendants necessarily warranted that such bills and records related to lawfully rendered and necessary treatment for their patients' care, recovery, or rehabilitation.

349.   There are no less than eleven (11) separate reasons why the defendants' alleged treatment was not in fact performed, was not lawful, was not medically necessary, and was fraudulently billed to Allstate:

    a.   The defendants billed Allstate for treatment and services that were not actually provided.  Nextgen Pain billed Allstate for evaluation services, urine drug testing, and injections that were never performed.

    b.   The defendants used kickbacks and narcotics prescriptions to induce patients to present to their facilities and incentivized physicians to order and bill for medically unnecessary services.

    c.   Nextgen Pain, Nextgen Rehab, Metro Med Pain, Baydoun, and Kutob submitted fabricated records to Allstate in an attempt to hide the unqualified, unlawful, and unnecessary treatment billed.

    d.   Nextgen Pain, Nextgen Rehab, and Metro Med Pain billed Allstate for unlawful treatment as they each lacked the required licensure from the State of Michigan to bill for DME.

    e.   Nextgen Pain, Metro Med Pain, and Griesser prescribed medications, including narcotics, on a *pro forma* basis in an attempt to incentivize patients to continue to return to the clinic for medically unnecessary treatment.  The predetermined nature of the prescriptions written by the defendants is evidenced by the lack of influence of urine drug test results on their prescription habits, which continued without change even in the face of evidence that patients were abusing or diverting the drugs prescribed.

    f.  Nextgen Pain, Care Recovery, Metro Med Pain, and Griesser indiscriminately referred patients for physical therapy without any individual determination of medical necessity and without any evaluation of the efficacy of such treatment.

    g.  Nextgen Pain, Care Recovery, Metro Med Pain, and Griesser provided disability certificates that were entirely unnecessary and not based on the clinical needs of the patient.

    h.  Nextgen Pain and Metro Med Pain billed for unnecessary and excessive urine drug testing.  The defendants ordered and billed for drug testing for every patient at every appointment, regardless of whether medications were actually prescribed.  This demonstrates that the defendants billed for urine drug testing as part of a predetermined treatment protocol and not based upon the particular needs of the patient.

    i.  Nextgen Pain, Nextgen Rehab, Nextgen Diagnostics, Metro Med Pain, and Griesser ordered medically unnecessary diagnostic procedures in violation of applicable standards of care.

    j.  Nextgen Rehab, Care Recovery, and Metro Med Pain fraudulently upcoded office visits, as almost every office visit billed to Allstate was for level four (4) or level five (5) even though the office visits did not meet the criteria set by the AMA to bill at such high levels.  When done intentionally, upcoding constitutes a fraudulent billing practice.

    k.  The defendants charged Allstate grossly unreasonable and uncustomary amounts for the treatment and services billed.

350.  The foregoing facts – billing for services not rendered, fabricated records, unlawful treatment, excessive treatment, and misrepresenting the necessity of treatment billed by the defendants – were not, and could not have been, known to Allstate until it commenced its investigation of the defendants shortly before the filing of this action.

351.   Taken as a whole, the prevalence of such facts and the defendants' failure to abide by accepted standards of care render the treatment billed by the defendants unnecessary and unlawful.

352.   The fact of violations of medical standards is present with respect to every patient at issue in this Complaint, including those specific patient examples set out above and in the charts annexed hereto at Exhibits 1 through 5.

353.   Thus, each claim for payment (and accompanying medical records) under Michigan's No-Fault Act mailed to Allstate by, on behalf of, or with the knowledge of the defendants constitutes a misrepresentation because the treatment underlying the claim was not lawful and medically necessary (if performed at all), as it must be in order to be compensable under Michigan law.

354.   Moreover, each Health Insurance Claim Form ("HICF") submitted to Allstate by the defendants contained the following notation: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

355.   Through the submission of patient records, invoices, HICFs, and other medical documentation to Allstate via the U.S. Mail, the defendants attested to the fact, lawfulness, and medical necessity of the examinations, urine drug testing,

injections, diagnostic testing, DME, and ancillary services for which they billed Allstate.

356.   As the defendants did not render lawful and reasonably necessary medical treatment, and misrepresented the services purportedly performed, each bill and accompanying documentation submitted by or on behalf of the defendants to Allstate constitutes a material misrepresentation.

### B.   ALLSTATE'S JUSTIFIABLE RELIANCE

357.   The facially valid documents submitted to Allstate by the defendants were designed to, and did in fact, induce Allstate to rely on the documents.

358.   At all relevant times, the defendants concealed from Allstate facts regarding the fact, lawfulness, and medical necessity of medical services allegedly provided and referred by them to prevent Allstate from discovering that the claims submitted by and on behalf of the defendants were not compensable under the Michigan No-Fault Act.  As discussed above, the defendants also fabricated records to deceive Allstate.

359.   These misrepresentations include submitting false medical documentation, including HICFs, documenting the fact, lawfulness, and necessity of medical treatment and transportation services in order to seek payment under Michigan's No-Fault Act.

360.   Evidence of the fraudulent scheme detailed in this Complaint was not discovered until after patterns had emerged and Allstate began to investigate the defendants, revealing the true nature and full scope of their fraudulent scheme.

361.   Allstate had and has no contractual relationship with the defendants relative to the claims at issue herein and had no access to information or documents exposing the defendants' fraudulent conduct until it conducted the investigation that led to the filing of this action.

362.   Due to the defendants' material misrepresentations and other affirmative acts designed to conceal their fraudulent scheme, Allstate did not and could not have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

363.   In reliance on the defendants' misrepresentations, Allstate paid money to the defendants to its detriment.

364.   Allstate would not have paid these monies had the defendants provided true and accurate information about the fact, lawfulness, and necessity of the referrals and medical services provided.

365.   As a result, Allstate has paid in excess of $86,266 to the defendants in reasonable reliance on the false medical documentation and false representations regarding the defendants' eligibility for payment under the Michigan No-Fault Act.

## XIII.  **MAIL FRAUD RACKETEERING ACTIVITY**

366.   As discussed above, the referrals, treatment, and services purportedly billed by the defendants were not medically necessary, were unlawful, and were fraudulently billed.

367.   The objective of the scheme to defraud Allstate, which occurred throughout the period noted in Exhibits 1 through 5, was to collect No-Fault benefits to which the defendants were not entitled because the medical services rendered, if at all, were not necessary and were not lawfully rendered, were fraudulently billed, and were billed at excessive and unreasonable amounts.

368.   This objective necessarily required the submission of claims for payment to Allstate.

369.   The defendants created, prepared, and submitted false medical documentation and placed in a post office and/or authorized depository for mail matter things to be sent and delivered by the United States Postal Service.

370.   All documents, medical records, notes, reports, HICFs, medical diagnoses, letters, correspondence, and requests for payment in connection with the insurance claims referenced throughout this pleading traveled through the U.S. Mail.

371.   Every automobile insurance claim detailed herein involved at least one (1) use of the U.S. Mail, including the mailing of, among other things, the notice of

claim, insurance payments, benefits payment checks, and the return of the cancelled check drafts to the financial institution(s) from which the draft(s) were drawn.

372.  It was foreseeable to the defendants that mailing bills and medical records to Allstate would trigger mailings in furtherance of the scheme to defraud, including actual payment of fraudulent bills via checks mailed by Allstate.

373.  Every payment at issue in this Complaint where Allstate was induced to rely on the defendants' false medical records and bills was tendered via a check mailed by Allstate using the U.S. Mail.

374.  The fraudulent medical billing scheme detailed herein generated hundreds of mailings.

375.  A chart highlighting representative examples of mail fraud arising from the defendants' patient/business files is annexed hereto at Exhibit 6.

376.  As detailed herein, the defendants also submitted, caused to be submitted, or knew medical documentation and claims for payment would be submitted to Allstate via the U.S. Mail related to each exemplar patient discussed in this Complaint.

377.  It was within the ordinary course of business for Nextgen Pain, Nextgen Rehab, Nextgen Diagnostics, Care Recovery, and Metro Med Pain to submit claims for No-Fault payment to insurance carriers like Allstate through the U.S. Mail.

378.   Moreover, the business of billing for medical services by each of the Defendant Entities at issue herein is regularly conducted by fraudulently seeking payment to which each Defendant Entity is not entitled through the use of fraudulent communications sent via the U.S. Mail.

379.   In other words, discrete (claim- and patient-specific) instances of mail fraud are a regular way of doing business for each of the Defendant Entities.

380.   The Defendant Entities, at the direction and with the knowledge of their owners and managers (the individual defendants), continue to submit claims for payment to Allstate and, in some instances, continue to litigate against Allstate seeking to collect on unpaid claims.

381.   Thus, the defendants' commission of mail fraud continues.

382.   As all of the defendants named herein agreed that they would use (and, in fact, did use) the mail in furtherance of their scheme to defraud Allstate by seeking payment for services that are not compensable under the Michigan No-Fault Act, these defendants committed mail fraud, as defined in 18 U.S.C. § 1341.

383.   Allstate reasonably relied on the submissions it received from the defendants, including the representative submissions set out in Exhibit 6 annexed hereto and identified in the exemplar claims above.

384.   As the defendants agreed to pursue the same criminal objective (namely, mail fraud), they committed a conspiracy within the meaning of the RICO

Act, 18 U.S.C. § 1962(d), and are therefore jointly and severally liable for Allstate's damages.

## XIV.  DAMAGES

385.   Although it is not necessary for Allstate to calculate damages with specificity at this stage in the litigation, and Allstate's damages continue to accrue, Allstate's injury includes, but is not limited to, compensatory damages in excess of $86,266.

386.   Exhibits 7 through 11 annexed hereto and incorporated herein as if set forth in their entirety, identify monies paid by Allstate to the defendants by date, payor, patient claim number, check number, and amount.

387.   Exhibit 7 details payments made by Allstate to Nextgen Pain.

388.   Exhibit 8 details payments made by Allstate to Nextgen Rehab.

389.   Exhibit 9 details payments made by Allstate to Nextgen Diagnostics.

390.   Exhibit 10 details payments made by Allstate to Care Recovery.

391.   Exhibit 11 details payments made by Allstate to Metro Med Pain.

392.   Allstate's claim for compensatory damages, as set out in Exhibits 7 through 11, does not include payment made with respect to any Assigned Claim Facility/Michigan Automobile Insurance Placement Facility claimant.

393.   Every payment identified in Exhibits 7 through 11 was made by Allstate alone and Allstate has not been reimbursed for any of the payments itemized in Exhibits 7 through 11.

394.   Moreover, every payment identified in Exhibits 7 through 11 derives from a check sent by Allstate to the defendants through the U.S. Mail.

395.   As such, the defendants knew that the U.S. Mail would be used as part of their scheme to defraud as the defendants only mailed medical records and bills for the purpose of having Allstate rely on such documents and mail payment in response thereto.

396.   Allstate also seeks damages, in an amount to be determined at trial, related to the cost of claims handling/adjustment for claims mailed by the defendants, which includes the cost of investigation to uncover the fraudulent nature of the claims submitted by the defendants.

397.   Allstate investigated each of the defendants both individually and in connection with the comprehensive scheme detailed herein and incurred investigative and claims handling expenses with respect to each defendant.

## XV.   CAUSES OF ACTION

### COUNT I
#### VIOLATION OF 18 U.S.C. § 1962(c)
#### (Nextgen Pain Enterprise)
#### Against Nextgen Rehab LLC; Nextgen Diagnostics LLC; Abdul Baydoun; Nura Kutob; Ali Beydoun; Daoud Faraj, M.D.; and Horst Griesser, M.D.

398.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 397 set forth above as if fully set forth herein.

399.   Nextgen Pain constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

400.   In connection with each of the claims identified in the within Complaint, Nextgen Rehab LLC; Nextgen Diagnostics LLC; Abdul Baydoun; Nura Kutob; Ali Beydoun; Daoud Faraj, M.D.; and Horst Griesser, M.D. ("Count I defendants") intentionally caused to be prepared and mailed false medical documentation by Nextgen Pain, or knew that such false medical documentation would be mailed in the ordinary course of Nextgen Pain's business, or should have reasonably foreseen that the mailing of such false medical documentation by Nextgen Pain would occur, in furtherance of the Count I defendants' scheme to defraud.

401.   The Count I defendants employed, knew, or should have foreseen that two (2) or more mailings to demand and receive payment from Allstate on certain

dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 6.

402.   Among other things, medical records, bills, invoices, applications for insurance, and applications for benefits were delivered to Allstate through the U.S. Mail.

403.   Payments to Nextgen Pain from Allstate were transmitted through the U.S. Mail.

404.   As documented above, the Count I defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Nextgen Pain, which they knew would be billed by Nextgen Pain, in order to collect payment from Allstate.

405.   Baydoun and Kutob owned and managed Nextgen Pain and were responsible for all actions taken by Nextgen Pain and its employees and representatives.

406.   Griesser and Faraj rendered and facilitated the unlawful and medically unnecessary treatment, when treatment was in fact rendered, billed by Nextgen Pain.

407.   Ali Beydoun improperly solicited victims of motor vehicle accidents and paid kickbacks in order to direct individuals to Griesser at Nextgen Pain.

408.   Nextgen Rehab and its owner Baydoun sent patients to Nextgen Pain, facilitating the unlawful and medically unnecessary treatment, when treatment was in fact rendered, billed by Nextgen Pain.

409.   Nextgen Diagnostics and its owner Baydoun provided diagnostic testing, which allowed Nextgen Pain to continue billing for medically unnecessary services.

410.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Nextgen Pain for the benefit of the Count I defendants that would not otherwise have been paid.

411.   The Count I defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count I defendants to continue their fraudulent scheme without detection.

412.   By mailing, or agreeing that the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count I defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

413.   The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Nextgen Pain for the benefit of the Count I defendants.

414.   The Count I defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

415.   Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count I defendants' fraudulent acts.

416.   The Count I defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

417.   Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

418.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

419.   By virtue of the Count I defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

<u>COUNT II</u>
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Nextgen Pain Enterprise)**
**Against Nextgen Rehab LLC; Nextgen Diagnostics LLC; Abdul Baydoun;**
**Nura Kutob; Ali Beydoun; Daoud Faraj, M.D.; and Horst Griesser, M.D.**

420.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 397 set forth above as if fully set forth herein.

421.   Defendants Nextgen Rehab LLC, Nextgen Diagnostics LLC; Abdul Baydoun; Nura Kutob; Ali Beydoun; Daoud Faraj, M.D.; and Horst Griesser, M.D. ("Count II defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Nextgen Pain.

422.   The Count II defendants each agreed to further, facilitate, support, and operate the Nextgen Pain enterprise.

423.   As such, the Count II defendants conspired to violate 18 U.S.C. § 1962(c).

424.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Nextgen Pain even though Nextgen Pain was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

425.   The Count II defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

426.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count II defendants' unlawful conduct described herein.

427.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count II defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count II defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT III
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Nextgen Rehab Enterprise)
### Against Nextgen Diagnostics LLC and Abdul Baydoun

428.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 397 set forth above as if fully set forth herein.

429.   Nextgen Rehab constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

430.  In connection with each of the claims identified in the within Complaint, Nextgen Diagnostics LLC and Abdul Baydoun ("Count III defendants") intentionally caused to be prepared and mailed false medical documentation by Nextgen Rehab, or knew that such false medical documentation would be mailed in the ordinary course of Nextgen Rehab's business, or should have reasonably

foreseen that the mailing of such false medical documentation by Nextgen Rehab would occur, in furtherance of the Count III defendants' scheme to defraud.

431.   The Count III defendants employed, knew, or should have foreseen that two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 6.

432.   Among other things, medical records, bills, invoices, applications for insurance, and applications for benefits were delivered to Allstate through the U.S. Mail.

433.   Payments to Nextgen Rehab from Allstate were transmitted through the U.S. Mail.

434.   As documented above, the Count III defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Nextgen Rehab, which they knew would be billed by Nextgen Rehab, in order to collect payment from Allstate.

435.   Baydoun owned and managed Nextgen Rehab and was responsible for all actions taken by Nextgen Rehab and its employees and representatives.

436.   Nextgen Diagnostics provided diagnostic testing, which allowed Nextgen Rehab physicians to continue billing for medically unnecessary services.

437.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Nextgen Rehab for the benefit of the Count III defendants that would not otherwise have been paid.

438.   The Count III defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count III defendants to continue their fraudulent scheme without detection.

439.   By mailing, or agreeing that the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count III defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

440.   The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Nextgen Rehab for the benefit of the Count III defendants.

441.   The Count III defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

442.   Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count III defendants' fraudulent acts.

443.   The Count III defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

444.   Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

445.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

446.   By virtue of the Count III defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT IV
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Nextgen Rehab Enterprise)
### Against Nextgen Diagnostics LLC and Abdul Baydoun

447.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 397 set forth above as if fully set forth herein.

448.   Defendants Nextgen Diagnostics LLC and Abdul Baydoun ("Count IV defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Nextgen Rehab.

449.   The Count IV defendants each agreed to further, facilitate, support, and operate the Nextgen Rehab enterprise.

450.   As such, the Count IV defendants conspired to violate 18 U.S.C. § 1962(c).

451.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Nextgen Rehab even though Nextgen Rehab was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

452.   The Count IV defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

453.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count IV defendants' unlawful conduct described herein.

454.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count IV defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count IV defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

<u>COUNT V</u>
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Nextgen Diagnostics Enterprise)**
**Against Nextgen Pain Associates & Rehabilitation LLC; Nextgen Rehab LLC;**
**Abdul Baydoun; Nura Kutob; Daoud Faraj, M.D.; and Horst Griesser, M.D.**

455.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 397 set forth above as if fully set forth herein.

456.   Nextgen Diagnostics constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

457.   In connection with each of the claims identified in the within Complaint, Nextgen Pain Associates & Rehabilitation LLC; Nextgen Rehab LLC; Abdul Baydoun; Nura Kutob; Daoud Faraj, M.D.; and Horst Griesser, M.D. ("Count V defendants") intentionally caused to be prepared and mailed false medical documentation by Nextgen Diagnostics, or knew that such false medical documentation would be mailed in the ordinary course of Nextgen Diagnostics's business, or should have reasonably foreseen that the mailing of such false medical documentation by Nextgen Diagnostics would occur, in furtherance of the Count V defendants' scheme to defraud.

458.   The Count V defendants employed, knew, or should have foreseen that two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 6.

459.   Among other things, medical records, bills, invoices, applications for insurance, and applications for benefits were delivered to Allstate through the U.S. Mail.

460.   Payments to Nextgen Diagnostics from Allstate were transmitted through the U.S. Mail.

461.   As documented above, the Count V defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Nextgen Diagnostics, which they knew would be billed by Nextgen Diagnostics, in order to collect payment from Allstate.

462.   Baydoun owned and managed Nextgen Diagnostics and was responsible for all actions taken by Nextgen Diagnostics and its employees and representatives.

463.   Nextgen Pain, its manager Kutob, Nextgen Rehab, Griesser, and Faraj were responsible for the improper referrals that resulted in testing and services billed by Nextgen Diagnostics.

464.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Nextgen Diagnostics for the benefit of the Count V defendants that would not otherwise have been paid.

465.   The Count V defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count V defendants to continue their fraudulent scheme without detection.

466.   By mailing, or agreeing that the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count V defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

467.   The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Nextgen Diagnostics for the benefit of the Count V defendants.

468.   The Count V defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

469.   Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count V defendants' fraudulent acts.

470.   The Count V defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

471.   Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

472.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

473.   By virtue of the Count V defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT VI**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Nextgen Diagnostics Enterprise)**
**Against Nextgen Pain Associates & Rehabilitation LLC; Nextgen Rehab LLC;**
**Abdul Baydoun; Nura Kutob; Daoud Faraj, M.D.; and Horst Griesser, M.D.**

474.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 397 set forth above as if fully set forth herein.

475.   Defendants Nextgen Pain Associates & Rehabilitation LLC; Nextgen Rehab LLC; Abdul Baydoun; Nura Kutob; Daoud Faraj, M.D.; and Horst Griesser, M.D. ("Count VI defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Nextgen Diagnostics.

476.   The Count VI defendants each agreed to further, facilitate, support, and operate the Nextgen Diagnostics enterprise.

477.   As such, the Count VI defendants conspired to violate 18 U.S.C. § 1962(c).

478.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Nextgen Diagnostics even though Nextgen Diagnostics was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

479.   The Count VI defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

480.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count VI defendants' unlawful conduct described herein.

481.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count VI defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count VI defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VII
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Care Recovery Enterprise)
### Against Nextgen Pain Associates & Rehabilitation LLC; Abdul Baydoun; Nura Kutob; Ali Beydoun; Daoud Faraj, M.D.; and Horst Griesser, M.D.

482.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 397 set forth above as if fully set forth herein.

483.    Care Recovery constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

484.    In connection with each of the claims identified in the within Complaint, Nextgen Pain Associates & Rehabilitation LLC; Abdul Baydoun; Nura Kutob; Ali Beydoun; Daoud Faraj, M.D.; and Horst Griesser, M.D. ("Count VII defendants") intentionally caused to be prepared and mailed false medical documentation by Care Recovery, or knew that such false medical documentation would be mailed in the ordinary course of Care Recovery's business, or should have reasonably foreseen that the mailing of such false medical documentation by Care Recovery would occur, in furtherance of the Count VII defendants' scheme to defraud.

485.    The Count VII defendants employed, knew, or should have foreseen that two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 6.

486.   Among other things, medical records, bills, invoices, applications for insurance, and applications for benefits were delivered to Allstate through the U.S. Mail.

487.   Payments to Care Recovery from Allstate were transmitted through the U.S. Mail.

488.   As documented above, the Count VII defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Care Recovery, which they knew would be billed by Care Recovery, in order to collect payment from Allstate.

489.   Faraj owned and managed Care Recovery and was responsible for all actions taken by Care Recovery and its employees and representatives.

490.   Faraj and Griesser rendered and facilitated the unlawful and medically unnecessary treatment, when treatment was in fact rendered, billed by Care Recovery.

491.   Ali Beydoun improperly solicited victims of motor vehicle accidents and paid kickbacks in order to direct individuals to Griesser at Care Recovery.

492.   Nextgen Pain, including its owner Baydoun and manager Kutob, sent patients to Care Recovery, facilitating the unlawful and medically unnecessary treatment, when treatment was in fact rendered, billed by Care Recovery.

493.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Care Recovery for the benefit of the Count VII defendants that would not otherwise have been paid.

494.   The Count VII defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count VII defendants to continue their fraudulent scheme without detection.

495.   By mailing, or agreeing that the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count VII defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

496.   The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Care Recovery for the benefit of the Count VII defendants.

497.   The Count VII defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

498.   Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count VII defendants' fraudulent acts.

499.   The Count VII defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

500.   Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

501.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

502.   By virtue of the Count VII defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VIII
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Care Recovery Enterprise)
**Against Nextgen Pain Associates & Rehabilitation LLC; Abdul Baydoun; Nura Kutob; Ali Beydoun; Daoud Faraj, M.D.; and Horst Griesser, M.D.**

503.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 397 set forth above as if fully set forth herein.

504.   Defendants Nextgen Pain Associates & Rehabilitation LLC; Abdul Baydoun; Nura Kutob; Ali Beydoun; Daoud Faraj, M.D.; and Horst Griesser, M.D.

("Count VIII defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Care Recovery.

505.   The Count VIII defendants each agreed to further, facilitate, support, and operate the Care Recovery enterprise.

506.   As such, the Count VIII defendants conspired to violate 18 U.S.C. § 1962(c).

507.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Care Recovery even though Care Recovery was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

508.   The Count VIII defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

509.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count VIII defendants' unlawful conduct described herein.

510.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count VIII defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims

submitted by or on behalf of the Count VIII defendants, and others acting in concert

with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT IX**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Metro Med Pain Enterprise)**
**Against Care Recovery LLC; Ali Beydoun; Daoud Faraj, M.D.;**
**and Horst Griesser, M.D.**

511.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs

1 through 397 set forth above as if fully set forth herein.

512.   Metro Med Pain constitutes an enterprise, as defined in 18 U.S.C. §

1961(4), engaged in, and the activities of which affect, interstate commerce.

513.   In connection with each of the claims identified in the within

Complaint, Care Recovery LLC; Ali Beydoun; Daoud Faraj, M.D.; and Horst

Griesser, M.D. ("Count IX defendants") intentionally caused to be prepared and

mailed false medical documentation by Metro Med Pain, or knew that such false

medical documentation would be mailed in the ordinary course of Metro Med Pain's

business, or should have reasonably foreseen that the mailing of such false medical

documentation by Metro Med Pain would occur, in furtherance of the Count IX

defendants' scheme to defraud.

514.   The Count IX defendants employed, knew, or should have foreseen that

two (2) or more mailings to demand and receive payment from Allstate on certain

96

dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 6.

515.   Among other things, medical records, bills, invoices, applications for insurance, and applications for benefits were delivered to Allstate through the U.S. Mail.

516.   Payments to Metro Med Pain from Allstate were transmitted through the U.S. Mail.

517.   As documented above, the Count IX defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Metro Med Pain, which they knew would be billed by Metro Med Pain, in order to collect payment from Allstate.

518.   Ali Beydoun owned and managed Metro Med Pain and was responsible for all actions taken by Metro Med Pain and its employees and representatives.

519.   Care Recovery, including its owner Faraj, sent patients to Metro Med Pain, facilitating the unlawful and medically unnecessary treatment, when treatment was in fact rendered, billed by Metro Med Pain.

520.   Griesser rendered and facilitated the unlawful and medically unnecessary treatment, when treatment was in fact rendered, billed by Metro Med Pain.

521.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Metro Med Pain for the benefit of the Count IX defendants that would not otherwise have been paid.

522.   The Count IX defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count IX defendants to continue their fraudulent scheme without detection.

523.   By mailing, or agreeing that the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count IX defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

524.   The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Metro Med Pain for the benefit of the Count IX defendants.

525.   The Count IX defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

526.   Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count IX defendants' fraudulent acts.

527.   The Count IX defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

528.   Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

529.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

530.   By virtue of the Count IX defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT X
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Metro Med Pain Enterprise)
### Against Care Recovery LLC; Ali Beydoun; Daoud Faraj, M.D.;
### and Horst Griesser, M.D.

531.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 397 set forth above as if fully set forth herein.

532.   Defendants Care Recovery LLC; Ali Beydoun; Daoud Faraj, M.D.; and Horst Griesser, M.D. ("Count X defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Metro Med Pain.

533.   The Count X defendants each agreed to further, facilitate, support, and operate the Metro Med Pain enterprise.

534.   As such, the Count X defendants conspired to violate 18 U.S.C. § 1962(c).

535.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Metro Med Pain even though Metro Med Pain was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

536.   The Count X defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

537.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count X defendants' unlawful conduct described herein.

538.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count X defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count X defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XI
## COMMON LAW FRAUD
### Against All Defendants

539.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 397 set forth above as if fully set forth herein.

540.   The scheme to defraud perpetrated by Nextgen Pain Associates & Rehabilitation LLC; Nextgen Rehab LLC; Nextgen Diagnostics LLC; Care Recovery LLC; Metro Med Pain Management & Rehab PLC; Abdul Baydoun; Nura Kutob; Ali Beydoun; Daoud Faraj, M.D.; and Horst Griesser, M.D. ("Count XI defendants") was dependent upon a succession of material misrepresentations of fact that the defendants were lawfully and actually providing necessary services in compliance with the Michigan No-Fault Act and were entitled to collect benefits thereunder.

541.   The misrepresentations of fact made by the Count XI defendants include, but are not limited to, those material misrepresentations discussed in section XII *supra*.

542.   The Count XI defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

543.   The misrepresentations were intentionally made by the Count XI defendants in furtherance of their scheme to defraud Allstate by submitting, causing

to be submitted, or knowing that non-compensable claims for payment under the Michigan No-Fault Act would be submitted to Allstate.

544.   The Count XI defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that are not compensable under Michigan law.

545.   Allstate reasonably relied upon such material misrepresentations to its detriment in paying numerous non-meritorious bills for alleged medical expenses pursuant to No-Fault insurance claims and in incurring expenses related to the adjustment and processing of claims submitted by the defendants.

546.   As a direct and proximate result of the defendants' fraudulent representations and acts, Allstate has been damaged in its business and property as previously described herein.

**COUNT XII**
**CIVIL CONSPIRACY**
**Against All Defendants**

547.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 397 set forth above as if fully set forth herein.

548.   Defendants Nextgen Pain Associates & Rehabilitation LLC; Nextgen Rehab LLC; Nextgen Diagnostics LLC; Care Recovery LLC; Metro Med Pain Management & Rehab PLC; Abdul Baydoun; Nura Kutob; Ali Beydoun; Daoud Faraj, M.D.; and Horst Griesser, M.D. ("Count XII defendants") combined and

concerted to accomplish the unlawful purpose of defrauding Allstate by submitting claims for payment under the No-Fault Act to which they were not entitled because (1) the defendants did not actually render the treatment for which claims were submitted, (2) the defendants did not provide reasonably necessary medical treatment, (3) the defendants did not lawfully render treatment, and (4) the defendants did not submit reasonable charges to Allstate.

549.   The Count XII defendants worked together to achieve an unlawful purpose (namely, defrauding Allstate for personal gain).

550.   This purpose was known to all of the Count XII defendants and intentionally pursued.

551.   Despite knowing that the defendants were not entitled to payment under the No-Fault Act because they billed for services that were not actually provided, because they billed for services that were not reasonably necessary, because treatment was not lawfully rendered, and because they charged outrageous and unreasonable prices, the Count XII defendants nonetheless submitted, caused to be submitted, or knew that claims would be submitted (with accompanying false medical documentation) to Allstate seeking payment to the defendants.

552.   In reasonable reliance on the false medical documentation submitted by the defendants, Allstate paid certain of the claims submitted.

553.   All of the Count XII defendants directly benefited from the payments made to Nextgen Pain Associates & Rehabilitation LLC; Nextgen Rehab LLC; Nextgen Diagnostics LLC; Care Recovery LLC; and Metro Med Pain Management & Rehab PLC.

554.   All of the Count XII defendants actively and intentionally partook in a scheme to defraud Allstate and also encouraged and aided other Count XII defendants in the commission of acts done for the benefit of all Count XII defendants and to the unjustified detriment of Allstate.

555.   Accordingly, all of the Count XII defendants are equally liable for the fraud perpetrated on Allstate pursuant to their conspiracy.

**COUNT XIII**
**PAYMENT UNDER MISTAKE OF FACT**
**Against Nextgen Pain Associates & Rehabilitation LLC; Nextgen Rehab LLC; Nextgen Diagnostics LLC; Care Recovery LLC; and Metro Med Pain Management & Rehab PLC**

556.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 397 set forth above as if fully set forth herein.

557.   Allstate paid the amounts described herein and itemized in Exhibits 7 through 11 under a misunderstanding, misapprehension, error, fault, or ignorance of material facts, namely, the scheme to defraud Allstate by misrepresenting the fact, lawfulness, and necessity of services purportedly provided and billed by Nextgen Pain Associates & Rehabilitation LLC; Nextgen Rehab LLC; Nextgen Diagnostics

LLC; Care Recovery LLC; and Metro Med Pain Management & Rehab PLC ("Count XIII defendants").

558.   Allstate sustained damages by paying under a mistake of fact the claims submitted by the Count XIII defendants, which misrepresented the fact, reasonableness, necessity, and lawfulness of the medical services allegedly rendered and whether the patient's injury arose out of a motor vehicle accident.

559.   The Count XIII defendants, individually and jointly, would be unjustly enriched if permitted to retain the payments made to them by Allstate under a mistake of fact.

560.   Allstate is entitled to restitution from each of the Count XIII defendants, individually and jointly, for all monies paid to and/or received by them from Allstate.

## COUNT XIV
## UNJUST ENRICHMENT
### Against All Defendants

561.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 397 set forth above as if fully set forth herein.

562.   Allstate paid monies, including those amounts set out in Exhibits 7 through 11, in response to the claims submitted and caused to be submitted by Nextgen Pain Associates & Rehabilitation LLC; Nextgen Rehab LLC; Nextgen Diagnostics LLC; Care Recovery LLC; Metro Med Pain Management & Rehab PLC; Abdul Baydoun; Nura Kutob; Ali Beydoun; Daoud Faraj, M.D.; and Horst

Griesser, M.D. ("Count XIV defendants") in reasonable belief that it was legally obligated to make such payments based upon the defendants' fraudulent misrepresentations.

563.    Allstate's payments constitute a benefit that the Count XIV defendants aggressively sought and voluntarily accepted.

564.    The Count XIV defendants wrongfully obtained payments from Allstate through the fraudulent scheme detailed herein.

565.    The Count XIV defendants have been unjustly enriched by receipt of these wrongfully obtained payments from Allstate.

566.    The Count XIV defendants' retention of these payments would violate fundamental principles of justice, equity, and good conscience.

## COUNT XV
## DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
### Against All Defendants

567.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 397 set forth above as if fully set forth herein.

568.    Defendants Nextgen Pain Associates & Rehabilitation LLC; Nextgen Rehab LLC; Nextgen Diagnostics LLC; Care Recovery LLC; Metro Med Pain Management & Rehab PLC; Abdul Baydoun; Nura Kutob; Ali Beydoun; Daoud Faraj, M.D.; and Horst Griesser, M.D. ("Count XV defendants") routinely billed for

unnecessary and unlawful services with respect to the patients at issue in this Complaint.

569.   The Count XV defendants also billed for services pursuant to a fraudulent scheme whereby patients were illegally solicited and referred to them for the purpose of generating claims to Allstate, and not for the purpose of providing reasonably necessary medical treatment, testing, or services.

570.   Pursuant to the Michigan No-Fault Act, an insurer is liable to pay benefits only for reasonable and necessary expenses for lawfully rendered treatment arising out of a motor vehicle accident.   Mich. Comp. Laws §§ 500.3105 and 500.3107.

571.   The lack of reasonableness and necessity are defenses to an insurer's obligation to pay No-Fault benefits arising out of a motor vehicle accident.  Mich. Comp. Laws § 500.3107.

572.   The lack of lawfully-rendered treatment (such as lack of licensure) is also a defense to an insurer's obligation to pay No-Fault benefits.

573.   Where a provider is unable to show that an expense has been incurred for a reasonably necessary product or service arising out of a motor vehicle accident, there can be no finding of a breach of the insurer's duty to pay, and thus no finding of liability with regard to that expense.

574.   Further, providers may only charge a reasonable amount for the products, services, and accommodations rendered.   Mich. Comp. Laws § 500.3157(1).

575.   The Count XV defendants continue to submit claims under the No-Fault Act for unnecessary and unlawfully rendered medical services to Allstate, and other claims remain pending with Allstate.

576.   The Count XV defendants will continue to bill Allstate for No-Fault benefit payments absent a declaration by this Court that Allstate has no obligation to pay fraudulent pending and previously-denied No-Fault claims submitted by any of the Count XV defendants for any or all of the reasons set out in the within Complaint.

577.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XV defendants billed for unnecessary and unlawful treatment that is not compensable under Michigan's No-Fault Act.

578.   Allstate also requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XV defendants were engaged in a fraudulent scheme whereby they billed for unnecessary and unlawful treatment and submitted unreasonable charges for the same to Allstate at all relevant times.

579.   As such, the Count XV defendants have no standing to submit, pursue, or receive No-Fault benefits or any other payment from Allstate, and Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XV defendants cannot seek payment from Allstate for benefits under Michigan's No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq*., any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the fraudulent conduct detailed in the within Complaint.

580.   Allstate further requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XV defendants cannot balance bill or otherwise seek payment from any person insured under an Allstate policy or for whom Allstate is the responsible payor related to the fraudulent conduct detailed in the within Complaint.

## XVI.  DEMAND FOR RELIEF

WHEREFORE, plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company respectfully pray that judgment enter in their favor as follows:

## COUNT I
### VIOLATION OF 18 U.S.C. § 1962(c)
**(Nextgen Pain Enterprise)**
**Against Nextgen Rehab LLC; Nextgen Diagnostics LLC; Abdul Baydoun; Nura Kutob; Ali Beydoun; Daoud Faraj, M.D.; and Horst Griesser, M.D.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT II
### VIOLATION OF 18 U.S.C. § 1962(d)
**(Nextgen Pain Enterprise)**
**Against Nextgen Rehab LLC; Nextgen Diagnostics LLC; Abdul Baydoun; Nura Kutob; Ali Beydoun; Daoud Faraj, M.D.; and Horst Griesser, M.D.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT III
### VIOLATION OF 18 U.S.C. § 1962(c)
#### (Nextgen Rehab Enterprise)
#### Against Nextgen Diagnostics LLC and Abdul Baydoun

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT IV
### VIOLATION OF 18 U.S.C. § 1962(d)
#### (Nextgen Rehab Enterprise)
#### Against Nextgen Diagnostics LLC and Abdul Baydoun

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT V
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Nextgen Diagnostics Enterprise)
### Against Nextgen Pain Associates & Rehabilitation LLC; Nextgen Rehab LLC; Abdul Baydoun; Nura Kutob; Daoud Faraj, M.D.; and Horst Griesser, M.D.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT VI
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Nextgen Diagnostics Enterprise)
### Against Nextgen Pain Associates & Rehabilitation LLC; Nextgen Rehab LLC; Abdul Baydoun; Nura Kutob; Daoud Faraj; and Horst Griesser, M.D.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT VII
### VIOLATION OF 18 U.S.C. § 1962(c)
#### (Care Recovery Enterprise)
**Against Nextgen Pain Associates & Rehabilitation LLC; Abdul Baydoun; Nura Kutob; Ali Beydoun; Daoud Faraj, M.D. and Horst Griesser, M.D.**

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT VIII
### VIOLATION OF 18 U.S.C. § 1962(d)
#### (Care Recovery Enterprise)
**Against Nextgen Pain Associates & Rehabilitation LLC; Abdul Baydoun; Nura Kutob; Ali Beydoun; Daoud Faraj, M.D. and Horst Griesser, M.D.**

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT IX
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Metro Med Pain Enterprise)
### Against Care Recovery LLC; Ali Beydoun; Daoud Faraj, M.D.;
### and Horst Griesser, M.D.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT X
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Metro Med Pain Enterprise)
### Against Care Recovery LLC; Ali Beydoun; Daoud Faraj, M.D.;
### and Horst Griesser, M.D.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XI
## COMMON LAW FRAUD
### Against All Defendants

(a)     AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)     AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)     GRANT all other relief this Court deems just.

## COUNT XII
## CIVIL CONSPIRACY
### Against All Defendants

(a)     AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)     AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)     GRANT all other relief this Court deems just.

## COUNT XIII
## PAYMENT UNDER MISTAKE OF FACT
### Against Nextgen Pain Associates & Rehabilitation LLC; Nextgen Rehab LLC; Nextgen Diagnostics LLC; Care Recovery LLC; and Metro Med Pain Management & Rehab PLC

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial; and

(b)     GRANT all other relief this Court deems just.

## COUNT XIV
## UNJUST ENRICHMENT
### Against All Defendants

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial; and

(b)     GRANT all other relief this Court deems just.

## COUNT XV
## DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
### Against All Defendants

(a)     DECLARE that Allstate has no obligation to pay pending and previously denied No-Fault insurance claims submitted by Nextgen Pain Associates & Rehabilitation LLC; Nextgen Rehab LLC; Nextgen Diagnostics LLC; Care Recovery LLC; Metro Med Pain Management & Rehab PLC; Abdul Baydoun; Nura Kutob; Ali Beydoun; Daoud Faraj, M.D.; and Horst Griesser, M.D. for any or all of the reasons set out in the within Complaint;

(b)     DECLARE that Nextgen Pain Associates & Rehabilitation LLC; Nextgen Rehab LLC; Nextgen Diagnostics LLC; Care Recovery LLC; Metro Med Pain Management & Rehab PLC; Abdul Baydoun; Nura Kutob; Ali Beydoun; Daoud Faraj, M.D.; and Horst Griesser, M.D., jointly and severally, cannot seek payment from Allstate for benefits under Michigan's No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq*., any policy of insurance, any assignment of benefits, any

lien of any nature, or any other claim for payment related to the fraudulent conduct detailed in the within Complaint;

(c)     DECLARE that Nextgen Pain Associates & Rehabilitation LLC; Nextgen Rehab LLC; Nextgen Diagnostics LLC; Care Recovery LLC; Metro Med Pain Management & Rehab PLC; Abdul Baydoun; Nura Kutob; Ali Beydoun; Daoud Faraj, M.D.; and Horst Griesser, M.D., jointly and severally, cannot balance bill or otherwise seek payment from any person insured under an Allstate policy or for whom Allstate is the responsible payor related to the fraudulent conduct detailed in the within Complaint; and

(d)     GRANT such other relief as this Court deems just and appropriate under Michigan law and the principles of equity.

## XVII. <u>JURY DEMAND</u>

The plaintiffs hereby demand a trial by jury on all clams.

[SIGNATURE PAGE FOLLOWS]

Respectfully submitted,

SMITH & BRINK

*/s/ Jacquelyn A. McEttrick*

_____

Richard D. King, Jr.
rking@smithbrink.com
Nathan A. Tilden (P76969)
ntilden@smithbrink.com
Jacquelyn A. McEttrick
jmcettrick@smithbrink.com
John D. Tertan
jtertan@smithbrink.com
38777 Six Mile Road, Suite 314
Livonia, MI 48152
(734) 521-9000

350 Granite Street, Suite 2204
Braintree, MA 02184
(617) 770-2214

*Attorneys for Plaintiffs*
*Allstate Insurance Company,*
*Allstate Fire and Casualty Insurance*
*Company, and Allstate Property and*
*Casualty Insurance Company*

Dated:  October 1, 2020